2000 ME 173

**Lou Ann FRANCIS et al.**

v.

**Charles B. STINSON et al.**

Supreme Judicial Court of Maine.

Argued Nov. 3, 1999.
Decided Oct. 17, 2000.

Sandra Hylander Collier, Esq., (orally), William S. Silsby Jr., Esq., Ellsworth, for plaintiffs.

Kate S. Debevoise, Esq., (orally), Peter J. Rubin, Esq., Bernstein, Shur Sawyer & Nelson, P.A., Portland, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Lou Ann Francis, Arnold Francis, Arnold G. Francis, Marion Alley, Eva Wight, Carla Intza, and Jean Rakoske appeal from judgments entered in the Superior Court (Hancock County, *Mead, J.*) dismissing some of their claims, and awarding summary judgment to the defendants Charles Stinson, Calvin Stinson Jr., and Camp Hills, Inc. (as successor in interest to Stinson Canning Company) on other claims. The court dismissed the plaintiffs' claims for breach of fiduciary duty (all but one aspect of Count I, and all of Count II), breach of contract (Count III), negligent misrepresentation (Count IV), and, as to some of the plaintiffs, constructive trust

(Count V) because they were barred by the applicable statutes of limitations. The court entered summary judgments against the plaintiffs on the remaining claims for breach of fiduciary duty (part of Count I), constructive trust (Count V), interference with a legacy (Count VI), fraud (Count VII), and fraud in the inducement (Count VIII).[1] Finding no error, we affirm the judgments.

## I. BACKGROUND

[¶ 2] The parties' statements of material fact establish the following: The Stinson Canning Company was established by Calvin Stinson Sr. many years ago. Between 1950 and the late 1970s, Calvin Sr. made gifts of stock in the company to his six children and his grandchildren such that by the late 1970s each of six families owned approximately one-sixth of the company.

[¶ 3] Calvin Sr.'s two sons, Calvin Stinson Jr. and Charles Stinson, worked with him in the family business. In 1975, the company was reorganized to give Calvin Jr., Charles, and their wives 100% of the voting stock in the company. Calvin Jr., Charles, and their wives also signed an agreement with the company that allowed them, if they chose, to redeem the Stinson Canning Company stock at a value to be set every twelve to eighteen months by the company.

[¶ 4] After the reorganization and until 1990, when the company was sold, Charles was the company president, Calvin Jr. its treasurer. In addition, the two brothers,

along with Calvin Sr., until his death, constituted the company's board of directors.

[¶ 5] The Stinson Canning Company profited and grew in value between 1975 and 1980. Between 1978 and 1980, other businesses began to show interest in acquiring the company. One such company, Connors Brothers Ltd., offered $14 million for the company sometime prior to 1980.[2] By late 1979, the company's assets were valued at more than $20 million, and Charles believed that the company could be sold for $18 million.[3]

[¶ 6] The present dispute arises out of the sale of Stinson Canning Company stock by two of the six families that had been given stock by Calvin Sr. Calvin Sr.'s daughter, Lou Ann Francis, her husband Arnold, and her children, Arnold G. and Marion Alley, made the first sale in February of 1980 for approximately $700,000. Three years later, another of Calvin Sr.'s daughters, Eva Wight, her husband Carl, and her daughters, Carla Intza and Jean Rakoske, sold their stock to the company for approximately $1.9 million. The facts set out below reflect a view of the evidence most favorable to the plaintiffs.

## A. The Francis Family

[¶ 7] In the fall of 1979, Calvin Jr. called his sister Lou Ann and suggested that her family sell its stock to the corporation. Later that fall, Lou Ann received another phone call, this time from Charles, inquiring as to whether Lou Ann had decided to sell her family's stock. Charles told Lou Ann that her family's stock was worth

---

1. The defendants cross-appeal, asserting that if we conclude that certain counts in the complaint survive summary judgment, those claims are nevertheless barred by the statutes of limitations or should be dismissed for failure to join necessary parties. Because we affirm the Superior Court, we do not address the cross-appeal.

2. The company received other offers over the years as well, including one for $16 million.

3. Despite the increasing value of the company's stock, the company did not pay any

dividends to the shareholders. This created potential estate tax problems for the shareholders because, upon the death of a shareholder, the shareholder's estate would owe taxes on the value of the stock, but the stock could not easily be converted to cash to pay those taxes. In April of 1978, the company addressed this problem when the board of directors voted to offer to purchase as much stock from any deceased stockholder as was necessary to pay the applicable estate tax.

$300,000. Lou Ann was surprised at such a low offer and assumed that it was because the company was doing poorly.

[¶ 8] Lou Ann and her husband Arnold met with Charles who, according to Lou Ann, told her that he was not getting along with Calvin Jr. and that the company was having a "financial problem." Charles advised Lou Ann to sell her stock now because if the company got a good buyer, it would probably be sold. Charles also informed her that if she died, her inheritance taxes might ruin her husband's business, and that if the company filed for bankruptcy protection, her family would be responsible for one-sixth of the company's debts. Lou Ann later reported at her deposition that she was aware of the estate tax problem but was not aware that the company had eliminated that problem by implementing the stock repurchase program.

[¶ 9] Lou Ann and Arnold then visited with Calvin Jr., who acknowledged that he was not getting along well with Charles, and confirmed that "the company was rocky financially." Calvin Jr. added that Charles "and the rest of them wanted to sell the company," and that if he was in Lou Ann's position, he would sell his stock.

[¶ 10] Lou Ann never participated in the management of the company and had no representation on its board of directors. As far as she was concerned Charles and Calvin Jr. "were the company ... they ran Stinson Canning Company. They called all the shots." She trusted her two brothers and thought that they would only tell her what was "right or good." She even considered Charles to be her "little God" and said she "would never believe him to tell [her] a falsehood."

[¶ 11] While Lou Ann and Arnold were considering the $300,000 offer, a friend of theirs, J.C. Strout, disclosed that he knew a third party who might be interested in purchasing the stock. A few days later, Strout made an offer on behalf of Shaw Mudge of $10,000 per share of common stock and $100 per share of preferred stock for the Francis family's stock in Stinson Canning (a total of approximately $2,170,000).

[¶ 12] Lou Ann believed she was required by the by-laws of the company to inform it of the offer, so she wrote a letter to the company, signed by her entire family, which detailed the terms of Mudge's offer. After the company received the letter, Charles phoned Lou Ann and told her that her letter was a "joke" and that he "didn't have to pay [her] a goddamn thing." Charles then offered Lou Ann $700,000 for all of the Francis family stock.

[¶ 13] Lou Ann discussed the offer with her family. Arnold feared the estate tax consequences and the possible family liability if the company were to file for bankruptcy protection. Lou Ann also wanted to keep the business in the family, and so she phoned Charles and accepted his offer. When asked why she would turn down a $2,170,000 offer to accept a $700,000 offer, Lou Ann responded that she believed in her brothers and that they would not "have allowed an outsider to buy [her] stock."[4] Lou Ann and Arnold also relied on a statement made previously by Charles, in which he allegedly promised that, "if they sold [the company] and made a good profit out of it, then ... they would make up the difference" if Lou Ann accepted the company's offer. She further alleges that Charles also stated that if other family members sold their stock to the company at a higher price, the company would give the Francises the same amount.

[¶ 14] At some time during the negotiations, Lou Ann contacted her attorney, William Silsby Jr., and asked if he would

---

4. The Mudge offer was not the only indicator of value available to the Francises. Two years earlier, in February 1978, Lou Ann and Arnold had met with the company's lawyer and accountant, and had learned that the book value of the common stock was $8700 per share, nearly $6000 more per share than they received at the sale. The Francis family had also regularly received the company's financial statements showing its success.

consult with somebody to find out what the stock was worth. It is unclear what actions Silsby took on her behalf, but he did attend a meeting on January 12, 1980, along with the Wights and their lawyer, Duane Fitzgerald. Ida Trenholm, another daughter of Calvin Sr., also attended the meeting. At the meeting, Fitzgerald informed the Francises that he had reviewed the company's financial statements for 1976–1978 and had discovered that the company had had "three good years." Fitzgerald concluded, however, that the company could set the price it would pay for the stock, and he advised the Francises to take whatever the company offered.

[¶ 15] The sale of the Francis family stock to the company was held on February 4, 1980, at the company offices; the closing lasted approximately five minutes. With little discussion, the Francises signed the stock purchase agreements that the company presented to them. Lou Ann did not read the agreement because "my brothers and I had discussed this sale; and they're honorable people, so we just believed what they said. They wouldn't have me sign something I shouldn't be signing."

[¶ 16] The Francis family owned 202.844 shares of common stock and 1862 shares of preferred stock, which they sold for $2991.95 per share and $50 per share respectively (approximately $700,000 total).

[¶ 17] Each member of the Francis family signed stock purchase agreements which included the following disclosure statement:

4. *Disclosure.*

(a) Inquiries and Offers. The Seller has been advised that the officers and directors of the Company have, from time to time, received inquiries with regard to the possible acquisition of the outstanding stock or assets of the Company and its subsidiaries. The written inquiries received since July 1, 1978, include those received from:

[fourteen companies were listed]

In addition, the Seller is aware that the officers and directors of the Company have recently received two (2) offers to purchase the outstanding stock of the Company and its subsidiaries and one (1) offer to acquire the assets of the Company. These offers were received from:

(i) Katy Industries, Inc., proposed $15,000,000.00 purchase price by letter dated August 15, 1979, see Exhibit W attached;

(ii) Connors Bros. Limited, proposed $16,000,000.00 purchase price by letter dated October 26, 1979, see Exhibit X attached;

(iii) Rosenkranz & Company, two proposals between $11,000,000.00 and $16,000,000.00 by letter dated November 28, 1979, see Exhibit Y attached.

(b) Seller's Representations. Seller hereby acknowledges and represents that:

(i) The Company, through its President and Treasurer, has made available to her the opportunity to ask questions of, and receive answers from, the Company concerning inquiries and/or offers from third parties with regard to the purchase of the outstanding stock or assets of the Company and its subsidiaries and to obtain any additional information, to the extent the Company possesses such information or can acquire it with reasonable effort or expense, necessary to verify the accuracy of the information given to her;

(ii) The purchase and sale contemplated by Section 1 was initiated by her and the price for her Common Stock and Preferred Stock, as well as the other terms of this Agreement, were determined as a result of good faith negotiation between the Board of Directors of the Company and her;

(iii) The other shareholders of the Company may, at some future date, agree to sell the outstanding stock or substantially all of the assets of the

Company and its subsidiaries at a per share price in excess of that realized by her;

(iv) The purchase price . . . is accepted as full payment in consideration for her Common Stock and Preferred Stock.

Attachments referred to in the disclosure statements were not physically attached to the agreements, but were located in a manilla envelope on the table beside the agreements. The Francises, however, did not read the attachments before signing the agreements.

[¶ 18] The attachments contained the company's financial statements for the years 1976–79. The financial statements contained information regarding the company's assets, gross profits, and net earnings per share during those years. In their statement of material facts, the defendants summarized this information as follows:

Assets

| 12/29/79: | $20,555,120 |
| 12/30/78: | $15,102,965 |
| 12/31/77: | $12,746,264 |
| 01/01/77: | $11,051,755/$11,120,420 |
| 01/03/76: | $10,503,388 |

Gross Profit

| 12/29/79: | $8,095,424 |
| 12/30/78: | $7,233,416 |
| 12/31/77: | $6,441,876 |
| 01/01/77: | $4,822,346 |
| 01/02/76: | $3,554,416 |

Net Earnings Per Share

| 12/29/79: | [not provided] |
| 12/30/78: | $1,533.67 |
| 12/31/77: | $1,164.83 |
| 01/01/77: | $ 870.06 |
| 01/03/76: | $ 490.43 |

[¶ 19] Because the company would buy stock from a family member only if all of the stock owned by the family was sold, Lou Ann's son Arnold G. Francis and her daughter Marion Alley also sold their stock at the closing. Neither Arnold G. nor Marion recalls ever discussing the transaction with Charles or Calvin Jr., and they have no first hand knowledge of any of the representations made by their uncles to Lou Ann and Arnold.

B. The Wight Family

[¶ 20] Eva Wight was also aware of the estate tax problem. She was told that the estate taxes could "wipe out" her family, and she was advised to consider selling the stock back to the company for a "minimal" amount. Unlike Lou Ann, Eva became suspicious that her brothers were trying to "grab" her stock in the corporation. At about the same time, her husband, Carl, told Eva that he had spoken with Calvin Jr., who did not appear to approve of the "pressure tactics" being applied by the company.

[¶ 21] In September of 1979, Eva's daughter Ellen died, and her stock was turned in to the company. At that time, Carl hired Attorney Duane Fitzgerald to investigate the Stinson stock situation. After investigating the company's financial statements, stockholder lists, corporate books, and tax returns, Fitzgerald concluded that the company was in excellent financial condition. He advised the Wights that "if he were in their place and could get $1 million for the family's stock, he 'would take it and run.'"

[¶ 22] In October of 1980, Eva and Carl separated. By early 1981, Eva was experiencing financial difficulty and began to investigate the possibility of selling her stock back to the company. Her family agreed and she began negotiating with the company. During the entire negotiation, Eva did not obtain any additional financial information regarding the company's performance after 1980.

[¶ 23] On behalf of the company, Charles initially offered the Wights $700,000, the same amount the Francises had received. Eva rejected that offer and made a counteroffer of $2 million. The company rejected that offer and made three additional offers to Eva. She consulted her accountant regarding each offer from the company. He advised her to accept, and she did accept, an offer of $1.9 million ($8,883.18

per share of common stock and $50 per share of preferred stock) payable over a term of years at 13% interest.

[¶ 24] Eva testified that she was told that the company was in financial trouble, but could not remember who gave her that information. Eva's daughters, Carla Intza and Jean Rakoske, did not have any discussions with either Charles or Calvin Jr. regarding the sale of her stock in the company. Both also executed stock purchase agreements.

[¶ 25] In 1990, the company, comprising substantially the same assets as in 1980, was sold for $24 million. None of that money was paid to either the Francis family or the Wight family. A certified public accountant, Dennis Norton, concluded that, on the date it was sold back to the company, the fair market value of the Francis family stock was $2,254,591. Norton valued the Wight family stock at between $2,500,000 and $3,333,000 as of the date that stock was bought by the company.

C. Calvin Jr.'s Power of Attorney on Behalf of Calvin Sr.

[¶ 26] Calvin Sr. granted a power of attorney to Calvin Jr. in August of 1980. The document gave Calvin Jr. the power "to sell, mortgage, lease or otherwise dispose of any or all real estate owned by [Calvin Sr.] and to sign all deeds, mortgages, notes, leases and other documents necessary or convenient for the purpose and to join in any deed to release any rights by descent."

[¶ 27] Calvin Jr. used that power to sign certain deeds that conveyed land from Calvin Sr. to Stinson Canning Company. The purpose of the conveyances was to ensure that any company that was to buy Stinson Canning would have clear title to property that Stinson Canning had used but which had been held in Calvin Sr.'s name.

[¶ 28] The plaintiffs also allege in their complaint that Calvin Jr. and Charles obtained Calvin Sr.'s signature on some deeds while Calvin Sr. was incompetent.

The plaintiffs allege no facts regarding the role of Charles in obtaining these deeds. Calvin Jr. does acknowledge that he obtained Calvin Sr.'s signature on a number of deeds, but contends that he explained the deeds to his father and that his father understood, for the most part, what they were. Calvin Jr. also testified, however, that his father frequently did not understand what he was signing at that time in his life.

[¶ 29] Lou Ann's sister, Ida Trenholm, confirmed that "[i]t appeared ... that [Calvin Sr.] did not know what he was signing when he was presented with deeds to sign in his later years." The plaintiffs, however, offered no additional evidence regarding Calvin Sr.'s mental competence, and no evidence as to the specific instances when Calvin Sr. signed the deeds at issue.

[¶ 30] Sometime after the company was sold, at a meeting attended by Lou Ann, Eva, Calvin Jr. and Charles, Lou Ann mentioned the poor financial condition of the company at the time she sold her stock. When "Charles laughed back at [her] and [said] there wasn't a year that we didn't make money and a hell of a lot of it," Lou Ann became aware for the first time that some of the representations made by Charles and Calvin Jr. might be false.

[¶ 31] In October of 1995, the Francis family and the Wight family filed a complaint in the Superior Court naming Charles, Calvin Jr., and Camp Hills, Inc. as defendants. The complaint contained five counts. Count I alleges that the defendants had breached the fiduciary duty they owed to the Francis family by (1) misrepresenting the value of the company, the estate tax implications of holding stock, and the liability for the debts of the company; (2) promising to pay the Francis family the difference between the price they received and the price they would have received if the company was ever sold to a third party (the "fair share" claim); and (3) seizing corporate opportunities for their own benefit.

[¶ 32] Count II alleges that the defendants breached their fiduciary duty to the Wight family. It is similar to Count I except that it does not contain a "fair share" claim. Count III alleges that the defendants breached all the stock purchase agreements because the attached financial statements were "inaccurate and incomplete." Count IV alleges that the defendants made various negligent misrepresentations regarding the stock purchase transactions. Count V requests that the assets of the former Stinson Canning Company be held in constructive trust for the benefit of the plaintiffs.[5]

[¶ 33] The defendants filed a motion to dismiss each count of the complaint as time-barred by the applicable statutes of limitations. The Superior Court (Hancock County, *Mead, J.*) allowed the "fair share" claim of the Francis family in Count I to proceed against Calvin Jr. and Charles, but dismissed the remainder of Count I as time-barred. Counts II, III, and IV were also dismissed as barred by the statute of limitations. The court noted that the plaintiffs had alleged negligent misrepresentation, not fraud, and that therefore their claims were not saved pursuant to 14 M.R.S.A. § 859 (Supp.1999).[6]

[¶ 34] The plaintiffs were subsequently granted permission to amend their complaint. The amended complaint restates the original counts and adds three counts. Count VI alleges that the defendants wrongfully interfered with a legacy. It asserts that Calvin Jr. and Charles "obtained their late father's signature to certain deeds of real estate in the years im-

mediately before he died and during a time when the late Calvin L. Stinson, Sr., was mentally incompetent." Because Calvin Sr. received no consideration for the real estate, the plaintiffs claim that they have been denied the one-sixth interest in the property they would have received under Calvin Sr.'s will. Count VII alleges "an intentional plan or course of conduct to defraud [p]laintiffs of their fair shares in the family company, and in their father's estate," and Count VIII alleges intentional or reckless misrepresentations that induced the plaintiffs to sign the stock purchase agreements.

[¶ 35] After discovery, the parties made cross motions for summary judgments with respect to the outstanding claims. The Superior Court addressed the "fair share" claim of the Francis family contained in Count I, and concluded that the stock purchase agreement was clear, comprehensive, and unambiguous, and that the parol evidence rule operated to bar the admission of extrinsic evidence "to explain the contract." Because the agreement contained no "fair share" promise, the court entered summary judgment in favor of the defendants on the remainder of Count I.

[¶ 36] The court entered summary judgment on Count VI through VIII on the basis that the plaintiffs had presented insufficient evidence to support their claims.[7] In the alternative, the court held that these counts were also barred by the statute of limitations. The plaintiffs appeal both the dismissals on statute of limita-

---

5. We note that Count V, the plaintiffs' claim for a constructive trust, is not an independent ground for relief. Rather, it is a remedy and depends on other substantive claims for survival. *See Ruebsamen v. Maddocks,* 340 A.2d 31, 37–38 (Me.1975).

6. The statute provides:
   **§ 859. Limitation extended in cases of fraud**
   If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or

if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action, except as provided in section 3580.
   14 M.R.S.A. § 859 (Supp.1999).

7. Although the trial court used language more consistent with dismissal, the parties do not dispute that the court applied a summary judgment analysis.

tions grounds and the summary judgments in favor of the defendants.

## II. SUMMARY JUDGMENT

[¶ 37] The trial court entered a summary judgment against the plaintiffs on Counts VI (wrongful interference with a legacy), VII (fraud), and VIII (fraud in the inducement), and on the "fair share" portion of Count I (the fiduciary duty claim of the Francis family). When reviewing a grant of a summary judgment, we consider the facts in the light that is most favorable to the party against whom judgment was entered to determine whether the court committed an error of law. *Smith v. Cannell,* 1999 ME 19, ¶ 6, 723 A.2d 876, 878. We will affirm the judgment "if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573, 575. A genuine issue of material fact is present only when "there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *Prescott v. State Tax Assessor,* 1998 ME 250, ¶ 5, 721 A.2d 169, 171–72 (internal quotations omitted).

[¶ 38] Counts VII and VIII are the plaintiffs' claims for fraud and fraud in the inducement, respectively. The trial court determined that the plaintiffs had failed to present sufficient evidence to sustain any action for fraud. We thus look to see whether the facts alleged are sufficient to survive a motion for summary judgment.

[A] defendant is liable for fraud or deceit if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to [her] damage.... Reliance is unjustified only if

the plaintiff knows the representation is false or its falsity is obvious to [her]. *Letellier v. Small,* 400 A.2d 371, 376 (Me. 1979).

[¶ 39] A claim for fraud must be proved by evidence that shows that the existence of fraud is "highly probable." *Barnes v. Zappia,* 658 A.2d 1086, 1089 (Me.1995). A person may justifiably rely on a representation without investigating the truth or falsity of the representation unless the person knows that the statement is false or the falsity is obvious. *Letellier,* 400 A.2d at 376.

### A. The Francis Family's Fraud Claims

[¶ 40] With respect to the Francis family, the statement of material facts alleges that Calvin Jr. and Charles told them that (1) potential estate taxes could destroy Arnold Francis's business; (2) if Stinson Canning Company declared bankruptcy, the Francises would be liable for one sixth of the debts; (3) the company was in financial trouble; and (4) they would receive their "fair share" of the proceeds from any future sale of the company.

[¶ 41] The defendants point out, however, that the stock purchase agreement lists fourteen companies that had expressed interest in buying the company, and it also lists two companies that had made actual offers. The financial statements also contain recent balance sheets that make it clear that the company was not in financial trouble. Moreover, the defendants contend that it should have been obvious to the Francis family that any fair share promise was not enforceable because the stock purchase agreement stated explicitly that the Francises would receive no share of any future sale, and that any reliance on the representations was not reasonable.

[¶ 42] As a matter of general contract law, parties to a contract are deemed to have read the contract and are bound by its terms. *Ocor Prod. Corp. v. Walt*

*Disney Prod. Inc.*, 682 F.Supp. 90, 93 (D.N.H.1988). The terms of the stock purchase agreement signed by the Francis family so clearly spelled out the financial well being of the company that the falsity of any representations that the company was doing poorly, or that bankruptcy was likely, became obvious. Accordingly, any reliance on those representations is not reasonable. *See Letellier,* 400 A.2d at 376.

[¶ 43] Lou Ann argues, however, that she reasonably relied on the "fair share" promise made to her, and that she therefore justifiably disregarded the language in the agreement reflecting the strong financial state of the company. She relies on the admissibility of parol evidence to show that fraudulent fair share promise. Parol evidence may be introduced to show that a signed document does not bar all actions for fraud as a matter of law and that the contract does not reflect the intent of the parties. *Ferrell v. Cox,* 617 A.2d 1003, 1006 (Me.1992).

[¶ 44] This agreement, however, contained language that clearly contradicted the "fair share" promise. The agreement provided that payment to the Francis family for their shares of stock was accepted as "full payment," and further provided that other family members could sell their shares to the company at higher prices than the Francis family was realizing without an increased benefit to the Francises. There is no allegation that any representation was made to any member of the Francis family that such language could be disregarded, as there was in *Ferrell v. Cox,* 617 A.2d at 1006, and in *Harriman v. Maddocks,* 518 A.2d 1027 (Me.1986), where

the fraudulent inducement was directly related to the signing of the document.

[¶ 45] In *Ferrell v. Cox,* Ferrell noted that a utility easement presented to him by Cox appeared to give Cox an unrestricted easement. *Id.* at 1006. Cox told Ferrell that the utility company had insisted on the broader language and reassured Ferrell that he, Cox, had no intention of sharing the easement with others. *Id.*

[¶ 46] Likewise, in *Harriman v. Maddocks,* 518 A.2d 1027 (Me.1986), the Harrimans signed both a release form and cashed a check containing language exculpating the defendant from liability because they were assured by the defendant insurer that signing the documents would not preclude them from recovering for further medical expenses. *Harriman,* 518 A.2d at 1028–29. In both of those cases, we concluded that there was sufficient evidence to sustain an action of fraud in the inducement.

[¶ 47] In this case, however, there is no evidence that any "fair share" assurance was made to Lou Ann after she became aware of the contract language that imposed no fair share distribution obligation on the defendants, and indeed, clearly stated that other family members could receive more money for the sale of their shares than the Francis family. Despite such language, Lou Ann signed the agreement without any further assurance from the defendants. Because Lou Ann cannot demonstrate that her reliance on an earlier promise of fair share distribution was reasonable, the trial court correctly concluded that the Francis family could not vary the terms of the contract, and properly entered a summary judgment against them.[8]

---

8. Although the trial court did not address the issue, the Francis family also alleges the existence of a confidential relationship between Lou Ann and her brothers. A confidential relationship arises when one party actually places "trust and confidence" in another party and there exists "a great disparity of position and influence between the parties." *Ruebsamen,* 340 A.2d at 35. *See also Estate*

*of Campbell,* 1997 ME 212, ¶ 8, 704 A.2d 329, 331.

Lou Ann contends that her brothers ran the company and had far greater knowledge about the company and its value than did she, and that she placed great faith and trust in them. Lou Ann Francis, however, although a sister to Charles and Calvin Jr., was married and had her own family, her husband was in business, and she consulted with attorneys

## B. The Wight Family's Fraud Claims

[¶ 48] With respect to the Wights, the complaint alleges that, like Lou Ann, Eva Wight also relied on the defendants' intentional misrepresentations that the company was in financial trouble and that the family faced potentially "onerous estate tax consequences" if they continued holding the stock.[9] The parties' Rule 7(d) statements of fact, however, even when viewed in the light most favorable to the Wights, reveal that Eva could not state with any real certainty that it was one of the defendants who told her that the company was in financial trouble. Nor could Eva identify any false financial information provided by the company or the defendants prior to her sale of stock to the company.

[¶ 49] Moreover, the plaintiffs' own statement of material facts does not establish that the Wights, in making their decision to sell the stock, relied on the defendants representations regarding the potential estate tax consequences of continuing to hold the stock. To the contrary, Eva alleged that, when she was informed of the estate tax consequences and encouraged to sell her stock at a low price, she "became suspicious ... that her brothers were trying to grab her stock in the corporation." She added that she did not consider selling her stock until two years later, and then only because "she was in financial distress" and "because there was no income from the stock."

[¶ 50] Because the Wights failed to develop sufficient facts to establish fraud to a "high probability," and because the evidence does not reveal that Eva reasonably relied on the allegedly fraudulent misrepresentations, summary judgment was properly entered on the Wights' claims for fraud and fraud in the inducement.

## C. Tortious Interference with a Legacy

[¶ 51] Count VI is the plaintiffs' claim for tortious interference with a legacy. The trial court held both that this claim was barred by the statute of limitations and that the evidence was insufficient to support such a cause of action. We agree with the trial court that, even if the claim were to survive the statute of limitations challenge, the evidence presented is insufficient, and the defendants are entitled to a judgment as a matter of law on this claim.

[¶ 52] To succeed on their claim for tortious interference, the plaintiffs must prove that the defendants "unlawfully caused the decedent to convey intervivos property that would have passed to [them] through the will." *Burdzel*, 2000 ME 84, ¶ 9, 750 A.2d at 576. If the plaintiffs' Rule 7(d) statement of material facts does not establish facts sufficient to make out a prima facie case of tortious interference, the defendants are entitled to judgment as a matter of law. *Id.*

[¶ 53] In their amended complaint, the plaintiffs allege that the defendants obtained Calvin Sr.'s "signature to certain deeds of real estate ... during a time when the late Calvin L. Stinson, Sr., was mentally incompetent." They further allege that Calvin Sr. received no consideration for his interest in that real estate.

[¶ 54] The Rule 7(d) statement of material facts submitted by the plaintiffs, however, offers only the following evidence to support those allegations:

[1] It appeared to Ida Trenholm [the decedent's daughter] that her father did not know what he was signing when he

and with others about the sale of her stock. Moreover, the language of the stock purchase agreement clearly and directly contradicted the representations made by her brothers, including the fair share representation. The evidence of a confidential relationship between Lou Ann and her brothers was insuffi-

cient to withstand the motion for summary judgment.

9. The stock disclosure agreement signed by the Wights did not contain the disclaimer language that was present in the agreement signed by the Francis family.

was presented with deeds to sign in his later years.

[2] Calvin L. Stinson, Jr. signed certain deeds as power of attorney for his father.

[¶ 55] Even when viewed in the light most favorable to the plaintiffs, this evidence is insufficient to establish tortious interference. The plaintiffs fail to show that they were entitled to anything under the decedent's will, and also fail to demonstrate the nature of the deeds signed by the decedent, or that it was the defendants who presented the deeds to the decedent. Accordingly, a summary judgment was properly entered on Count VI.

## II. DISMISSALS

[¶ 56] The court dismissed all of the claims (except the "fair share" promise claim in Count I) as time-barred. Whether a claim is barred by the statute of limitations is a question of law, reviewed de novo. *See generally Williams v. Ford Motor Co.*, 342 A.2d 712 (Me.1975) (discussing how courts should determine when the statute of limitations begins to run). Because the statute of limitations is an affirmative defense, *Northeast Harbor Golf Club, Inc. v. Harris*, 1999 ME 38, ¶ 15, 725 A.2d 1018, 1023, a complaint will not be dismissed, pursuant to Rule 12(b)(6), as time-barred "unless the complaint contains within its four corners allegations of sufficient facts to show the existence and applicability of the defense," *Ripley v. Mercier*, 482 A.2d 850, 851 (Me. 1984) (quoting *MacKerron v. Madura*, 445 A.2d 680, 682 (Me.1982)) (internal quotations omitted).

[¶ 57] The assets of Stinson Canning Company were sold in 1990, at which time the name of the company changed from Stinson Canning Company to SST & S, Inc. SST & S was dissolved on May 10, 1993, when its articles of dissolution were filed with the Secretary of State. On that date, the company ceased to exist and the time began to run on the two-year statute of limitations for actions against a dis-

solved company. *See* 13–A M.R.S.A. § 1122(1) (1981). The complaint was filed in October of 1995, more than two years after SST & S, formerly known as Stinson Canning Company, was dissolved. Accordingly, the court properly dismissed Camp Hills, the successor in interest corporation, as a defendant.

[¶ 58] The statute of limitations period applicable to the plaintiffs claims against the defendants is six years. 14 M.R.S.A. § 752 (1980). Because the conduct of the defendants complained about occurred in the 1980s, and plaintiffs' complaint was filed in 1995, the six-year statute of limitations bars their action. The Legislature has extended the limitations period, however, in actions that allege fraud. 14 M.R.S.A. § 859 (Supp.1999). In a case of fraud, "the statute starts to run when the existence of the cause of action or fraud is discovered or should have been discovered by the plaintiff in the exercise of due diligence and ordinary prudence," *Westman v. Armitage*, 215 A.2d 919, 922 (Me.1966). A plaintiff has six years from that date to bring her action. 14 M.R.S.A. § 859 (Supp.1999).

[¶ 59] In this case, however, because the fraud claims are insufficient to survive the entry of a summary judgment, the plaintiffs have failed to establish fraud or fraudulent concealment sufficient to save, pursuant to section 859, any of their claims. Accordingly, dismissals were properly granted on all other claims because none of them were brought within six years of the actions or transactions on which their complaints are based.

The entry is:

Judgments affirmed.