STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-10-38
AMH - CUM - 9/15/2011

THOMAS BARR, JR. et al.,

        Plaintiffs

v.

RICHARD DYKE et al.,

        Defendants

)
)
)
)
)
)
)
)
)
)
)
)

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The Defendants in this case have moved for summary judgment on all claims in the Plaintiffs' Amended Complaint. Plaintiffs oppose the motions. Oral argument was held August 17, 2011. For the reasons stated below, the court grants the Defendants' motions.

*Background*

Plaintiffs Thomas Barr and Claude Warren have brought this action against Defendants Richard Dyke, Jeffrey Dyke, Allen Faraday, John DeSantis, Richard Thurston, Bangor Savings Bank as trustee of the Jeffrey Trust and the Jeffrey E. Dyke Irrevocable Trust, Thomas Kent, T. Scott Kent, and the Richard E. Dyke Foundation. Plaintiffs are former officers, directors and shareholders of a now dissolved corporation, Bushmaster Firearms, Inc. (hereinafter, "Bushmaster"). Plaintiffs' original complaint in this case was against Defendants Richard Dyke, Jeffrey Dyke, Faraday, DeSantis and Thurston, all of whom are alleged to have been officers and/or directors of Bushmaster during the periods at issue in this case. These five Defendants are referred to as the "Officer/Director Defendants." The two trusts through the Bank as trustee, the Foundation, and the two Kents were added as Defendants in the Plaintiffs' Amended Complaint and are alleged to have been shareholders in Bushmaster.

1

The gravamen of the Amended Complaint is that the five Officer/Director Defendants defrauded the Plaintiffs and breached their fiduciary duties to the Plaintiffs in connection with the settlement of litigation in 2004 between the Plaintiffs and three of the Officer/Director Defendants—Richard Dyke, Jeffrey Dyke and Allen Faraday. Specifically, the Plaintiffs say that, as part of the settlement, they were induced to sell their shares of Bushmaster stock back to the corporation at a price well below actual value, as a result of the Officer/Director Defendants' misrepresentations and willful omissions concerning the financial condition of Bushmaster.

Although the Officer/Director Defendants do not concede the truth of any of these allegations on the merits, their motion for summary judgment sidesteps the merits of the Plaintiffs' claim and focuses on releases and disclaimers that the Plaintiffs executed in connection with the settlement.

The undisputed facts are as follows. Plaintiffs Barr and Warren had been president and vice-president of Bushmaster during the 1990s and earlier, but by 2000 their involvement was limited to being shareholders. At that time, Barr owned 1,595 shares (equating to a 15.13% interest in Bushmaster), and Warren owned 1,471 shares (a 13.96% interest). In 2002, they brought suit against the Dykes and Faraday in a civil action captioned *Barr v. Dyke*, Me. Super. Ct., Docket No. CUMSC-CV-02-637 [hereinafter "the Prior Case"].

The Plaintiffs' complaint in the Prior Case alleged causes of action similar to those alleged in this case: breach of fiduciary duty by the Dykes and Faraday by means of fraud and fraudulent inducement. As to Richard Dyke, the Plaintiffs' alleged in the Prior Case that he acted with actual malice and bad faith and with the intent to defraud Plaintiffs Barr and Warren of their interests in employment with Bushmaster and their rights to the fair portion of the profits of Bushmaster.

In the Prior Case, counsel for the Plaintiffs engaged in extensive discovery on Plaintiffs' behalf, including ten depositions upon oral examination and six separate sets of document requests pursuant to M.R. Civ. P. 34. In August 2004, the parties to the Prior Case attended a judicially-assisted settlement conference [JASC] with former Superior Court Justice Robert Crowley. As a result of the JASC, the case settled on terms that included Plaintiffs selling all of their shares to the corporation for the sum of eight million dollars, or $2,609.26 per share.[1] The documents reflecting the settlement were negotiated and drafted between counsel for the Plaintiffs and the Defendants in the Prior Case following the conclusion of the JASC.

The settlement documents included a Stock Purchase Agreement under which Bushmaster purchased the Plaintiffs' shares. Among the negotiated provisions of the Stock Purchase Agreement were the following provisions:

(b)     Each Seller [Barr and Warren] hereby acknowledges, represents and warrants as follows:

(i)     Such Seller is familiar with the business, financial condition, results of operations, prospects and affairs of Purchaser [Bushmaster].

(ii)     Such Seller has made his own independent determination of the value of Purchaser and the Shares being sold by such Seller, based upon (inter alia) the valuation studies and analyses of Spinglass Associates, Sellers' financial adviser.[2]

(iii)     Such Seller has had a full and adequate opportunity to consult with, and has consulted with, his own counsel with respect to the transactions contemplated by this Agreement, and has had a full and adequate opportunity to consult with, and has consulted with, such other advisors and representatives as he has deemed necessary or desirable in order to advise such Seller in connection with the transactions contemplated by this Agreement.

---

[1] The court arrived at this figure by dividing the number of outstanding shares owned by Barr and Warren by the settlement amount, or: 8,000,000 / (1595 + 1471) = 2609.26.

[2] Although not within the parties' statements of material facts, by way of background, the reference to "Spinglass Associates" is to a consulting firm that Plaintiffs had retained in connection with the Prior Case to provide expert evidence on the damage to Plaintiffs resulting from the "waste and mismanagement" alleged against the Dykes and Faraday in the Prior case; Spinglass also made a preliminary valuation of Bushmaster.

3

> (iv)    Such Seller has not relied on Purchaser or any of its directors, officers, shareholders, employees or agents with respect to any assessment of the value of Purchaser or the Shares being sold by such Seller hereunder or the advisability of entering into this Agreement or the transactions contemplated by it.
>
> (v)    Such Seller . . . has received from the Purchaser all items requested by him concerning Purchaser, its business, assets, financial condition and prospects.[3]

The Stock Purchase Agreement also contained a comprehensive merger clause, and a provision affirming that "this Agreement has not been entered into under undue time pressure."

In consideration of the payment to them and as part of the settlement, the Plaintiffs dismissed their claims in the Prior Case with prejudice and executed General Releases in favor of Bushmaster as well as the Dykes and Faraday, and their respective officers, directors, shareholders, heirs, assigns, agents and attorneys. The Officer/Director Defendants fulfilled their obligations under the settlement by authorizing Bushmaster to pay the Plaintiffs eight million dollars for their shares.

In April 2006, Bushmaster was sold to another company for about $85,000,000. In April 2010, Plaintiffs filed their complaint in this action. They have since filed a six-count Amended Complaint as follows:

- Count I alleges breach of fiduciary duty against the two Dykes and Faraday in their capacity as directors of Bushmaster.

- Count II alleges breach of fiduciary duty against the five Officer/Director Defendants in their capacity as officers of Bushmaster.

- Count III alleges fraud against the Officer/Director Defendants.

- Count IV alleges unjust enrichment against the Officer/Director Defendants.

- Count V alleges intentional, reckless and/or negligent infliction of emotional distress against the Officer/Director Defendants.

---

[3] Although the parties dispute the significance of these provisions, Plaintiffs admit the accuracy of the cited provisions of the Stock Purchase Agreement. (Defs.' Supp. S.M.F. ¶¶ 18-22; Pls.' Opp. S.M.F. ¶¶ 18-22.)

4

- Count VI seeks rescission of the Stock Purchase Agreement as to all Defendants.

The circumstances underlying the Plaintiffs' claims need not be repeated in detail, but can be summarized as follows:

- At the time of settlement of the Prior Case, the Officer/Director Defendants knew Plaintiffs' shares to be worth far more than the $2,609.26 per share paid to them under the settlement agreement.

- The Officer/Director Defendants deliberately withheld and concealed from the Plaintiffs information, documents and other materials indicating the value of Bushmaster to be far higher than the value paid to Plaintiffs.

- The Officer/Director Defendants, primarily Richard Dyke, were talking up Bushmaster's prospects to investors while presenting a much gloomier picture to shareholders.

- The Officer/Director Defendants acted throughout their dealings with Plaintiffs with the intention of convincing Plaintiffs and possibly other shareholders to relinquish their shares for much less than their actual value.

All Defendants dispute the Plaintiffs' allegations and deny liability.

The Plaintiffs' highly detailed recitation of the facts and circumstances underlying their claims, coupled with supporting record evidence to support those assertions, more than suffice to constitute a prima facie showing of fraud and breach of fiduciary duty for purposes of withstanding summary judgment. Were the Plaintiffs' evidence believed by the fact finder, it could support a finding, even by clear and convincing evidence, that Richard Dyke at least and perhaps other Officer/Director Defendants are liable to the Plaintiffs for defrauding them of millions of dollars. But for the narrow set of issues raised by the Defendants, Plaintiffs' claims would likely survive summary judgment and proceed to trial.

The issues that Defendants raise, however, go to the heart of the Plaintiffs' ability to pursue claims. Defendants assert that the Plaintiffs' General Release, coupled with the merger

5

clause and the disclaimers of reliance that the Plaintiffs made in the Stock Purchase Agreement, entitle the Defendants to summary judgment.

*Analysis*

Under Rule 56 of the Maine Rules of Civil Procedure, a party seeking summary judgment must show that there are no genuine issues of material fact that require trial to the finder of fact, and that the moving party is entitled to judgment as a matter of law. "Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute." *Blue Star Corp. v. CKF Props. LLC*, 2009 ME 101, ¶ 23, 980 A.2d 1270, 1276 (citing *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825; *Stanley v. Hancock Cnty. Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174); *accord* M. R. Civ. P. 56. A party wishing to avoid summary judgment must present a prima facie case for the claim or defense that is asserted. *Reliance Nat'l Indem. v. Knowles Indus. Svcs.*, 2005 ME 29, ¶ 9, 868 A.2d 220, 224-25.

A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. A genuine issue of material facts exists "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 21-22.

1.    Defendants' Summary Judgment Argument and Plaintiffs' Response

In this case, the Defendants assert that they are entitled to judgment as a matter of law on the strength of the following analysis:

- To prove their claims, the Plaintiffs will have to prove that they justifiably relied on the Defendants in agreeing to enter into the Stock Purchase Agreement.

6

- Plaintiffs expressly disclaimed any reliance on the Defendants in the Stock Purchase Agreement. They also agreed through the merger clause that the Stock Purchase Agreement reflected the entire agreement.

- The disclaimers of reliance and other provisions of the Stock Purchase Agreement are clear and unambiguous, and parol evidence is not admissible to vary their terms.

- Having induced Bushmaster to pay them eight million dollars (and the Officer/Director Defendants to consent to Bushmaster doing so) on the basis of the disclaimer of reliance and other representations and warranties of the Plaintiffs, Plaintiffs are estopped now to contradict their disclaimer by claiming reliance.

- Because Plaintiffs cannot show justifiable reliance on the Defendants, Defendants are entitled to judgment as a matter of law.

Plaintiffs argue that their disclaimer of reliance and other limiting provisions of the Stock Purchase Agreement and General Releases are unenforceable against them because they were procured as a result of the Defendants' fraudulent inducement. They rely primarily on Maine cases holding that, "[w]hile it is true that a valid release will extinguish a cause of action . . . the release will nevertheless be set aside if shown to be the product of fraud, misrepresentation, or overreaching." *LeClair v. Wells*, 395 A.2d 452, 453 (Me. 1978); *accord Glynn v. Atlantic Seaboard Corp.*, 1999 ME 53, ¶ 10, 728 A.2d 117, 119; *Harriman v. Maddocks*, 518 A.2d 1027, 1030 (Me. 1986). However, the parties have not cited to any reported Maine decision involving a disclaimer of reliance clause similar to those here.[4]

It is clear that the Plaintiffs claim in their affidavits that they relied on statements of Richard Dyke and other Officer/Director Defendants in deciding to sell their stock is a contradiction of their acknowledgment and warranty that they did not rely on him or anyone else affiliated with Bushmaster in determining the value of the company and the value of their stock. The Law Court has repeatedly noted that a litigant will not be permitted to contradict a prior sworn or acknowledged statement, such as a statement during deposition testimony or in

---

[4] The minority shareholder buyout case of *Francis v. Stinson* evidently involved such a provision, but it is mentioned only in passing. *See* 2000 ME 173, P56, 760 A.2d 209, 220.

7

a deed provision, by means of an affidavit submitted to defeat a summary judgment motion. *See Blue Star Corp.*, 2009 ME 101, ¶¶ 31-34, 980 A.2d at 1278; *Schindler v. Nilsen*, 2001 ME 58, ¶ 9, 770 A.2d 638, 641-42; *Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733, 735.

However, that principle presumably does not apply when the sworn or acknowledged prior statement is induced by fraud, as is alleged here. Thus, the above principle cannot be applied to prevent the Plaintiffs from contradicting themselves unless their disclaimer of reliance is valid and enforceable against them. The issue, therefore, is whether the Plaintiffs' disclaimer of reliance provision in the Stock Purchase Agreement operates to preclude and negate their claim to have acted in reliance on the Defendants in deciding to sell their shares. If not, then their claims proceed; if so, then those claims that depend on proof of reliance as an element are barred. Because the Law Court has not yet analyzed the validity and enforceability of a disclaimer of reliance clause as a defense to fraudulent inducement, it is appropriate to examine how courts in other states have done so.

2. The State of the Law on Enforcing Disclaimer of Reliance Provisions Against Subsequent Claims of Fraud in the Inducement

Contractual disclaimers of reliance of the kind involved here have encountered a mixed reception at the hands of the courts. *See* Allen Blair, *A Matter of Trust: Should No-Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?*, 92 MARQ. L. REV. 423 (2009)[6]; Jeffrey

---

[6] Professor Blair depicts the legal landscape surrounding reliance provisions as follows:

> [A] survey of cases reveals that the decisions fall into three basic categories. First, a number of courts (in Category I) simply refuse to enforce such clauses. Second, others (in Category II) may enforce the clauses, but only subject to significant restrictions. For instance, some courts will enforce no-reliance clauses only if the seller can establish that the clauses were specifically negotiated-in other words, that the clauses are not boilerplate. Similarly, some courts will enforce only no-reliance clauses that are formalistically distinct from general merger clauses. Other courts may enforce such clauses only if the seller can establish that they address with particularity the very type of factual representation on which the buyer claims to be relying. Still other courts will

M. Lipshaw, *Of Fine Lines, Blunt Instruments, And Half-Truths: Business Acquisition Agreements And The Right To Lie*, 32 DEL. J. CORP. L. 431 (2007); Kabir Masson, Note, *Paradox Of Presumptions: Seller Warranties And Reliance Waivers In Commercial Contracts*, 109 COLUM. L. REV. 503 (2009).

The traditional approach refuses to permit such provisions to bar fraud claims, based on the longstanding precept that fraud vitiates all contracts it touches. The Supreme Judicial Court of Massachusetts formulated the rationale for not enforcing such provisions seventy years ago in terms that Plaintiffs might claim apply to this case:

> In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

*Bates v. Southgate*, 31 N.E.2d 551, 558 (1941); *see also Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.*, 38 Cal. Rptr. 2d 783, 788 n.7 (Cal. Ct. App. 1995) ("A party to a contract who has been guilty of fraud in its inducement cannot absolve himself from the effects of his fraud by any stipulation in the contract, either that no representations have been made, or that any right which might be grounded upon them is waived." (quotation marks omitted)).

---

allow the no-reliance clause to be considered by the trier of fact only as evidence of the reasonableness of the buyer's reliance in the particular circumstances of the case. Finally, a growing number of courts (in Category III) seem to be enforcing no-reliance clauses to bar claims of fraudulent inducement as a matter of law.

Allen Blair, *A Matter of Trust: Should No-Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?*, 92 MARQ. L. REV. 423, 439-40 (2009).

In their briefs, the parties have focused on two decisions of the Supreme Court of Texas, which has applied a formulaic approach to enforcing disclaimer of reliance provisions.[7] In *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), the Supreme Court of Texas held that "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." 959 S.W.2d at 181. The court further observed:

> Parties should be able to bargain for and execute a release barring all further dispute. This principle necessarily contemplates that parties may disclaim reliance on representations. And such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim. As an example, a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim.

*Id.* at 179. In *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008), the Texas Supreme Court identified the factors relevant to whether a disclaimer of reliance clause in a release will bar a subsequent effort to avoid the release based on fraudulent inducement:

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction;

---

[7] The parties' briefs also discuss *Italian Cowboy Partners, Ltd. v. Prudential Insurance Co. of America*, 341 S.W.3d 323 (Tex. 2011), but the course finds that case distinguishable from the present case because it did not involve a disclaimer of reliance clause. In fact, the opinion suggests that the absence of such a clause influenced the outcome. The court in *Italian Cowboy Partners* noted:

> The language of the contract at issue here differs significantly from the provisions at issue in *Schlumberger* and *Forest Oil*, where we determined there was an intent to disclaim reliance. . . . No such intent is evident in Italian Cowboy's lease contract, which provided only that "neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein," and that "this lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof." There is a significant difference between a party disclaiming its *reliance* on certain representations, and therefore potentially relinquishing the right to pursue any claim for which reliance is an element, and disclaiming the *fact* that no other representations were made.

341 S.W.3d at 335.

10

(4) the parties were knowledgeable in business matters; and (5) the release language was clear.

268 S.W.3d at 60.

Not all states, however, apply such a rigid approach to the reliance disclaimer clauses. As other commentators note,

> many states employ a less rigid approach [than the formulaic approach of the Texas courts], premising the enforceability of purported disclaimer provisions on the extent to which they supply evidence sufficient to negate the 'reliance' element of fraud and negligent misrepresentation claims as a matter of law. And in these states, the dispositive question is whether the language of the contract clearly evinces the signatories' intent to disregard the representations upon which the complaining party grounded its claim.

Glenn D. West & W. Benton Lewis, Jr., *Contracting to Avoid Extra-Contractual Liability—Can Your Contractual Deal Ever Really Be the "Entire" Deal?*, 64 BUS. LAW. 999, 1025 (2009).

The leading case in this line is *Danann Realty Corporation v. Harris*, 157 N.E.2d 597 (N.Y. 1959), in which the New York Court of Appeals decided that a disclaimer of reliance clause (also known as a no-representation clause) barred a fraudulent inducement claim that was premised on alleged misrepresentations of the very nature covered in the disclaimer. In *Danann*, the plaintiff claimed that the defendants had fraudulently induced him to purchase commercial leasehold rights by means of false oral statements about the profitability of the building. *Id.* at 598. However, the contract provided that the defendants were making no representation "as to the physical condition, rents, leases, expenses, operation or any other matter or thing affecting or related to the aforesaid premises." The contract also stated that "neither party is relying upon any statement or representation, not embodied in this contract, made by the other." *Id.* at 598-99. The Court of Appeals concluded that the disclaimer provision negated the fraud claim because it addressed the very subject of the fraud claim, noting that "to hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the

seller as to a particular fact." *Id.* at 600.

The holding in *Danann* has evolved into an operative principle: "The *Danann* rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 735 (2d. Cir. 1984); *accord Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 316 (2d Cir. 1993). As one commentary notes, "courts in many jurisdictions are willing to enforce provisions that clearly demonstrate that the complaining party intentionally and unequivocally waived its right to rely on the extra-contractual representation upon which it based its claim." West & Lewis, *supra,* at 1027.

The *Danann* rule thus differs from the Texas formula. The Texas approach focuses on factors similar to those employed in deciding issues of unconscionability—was the contract negotiated or boilerplate; were both parties represented by counsel; was it an arms-length transaction, et cetera. The *Danann* rule focuses more directly on the heart of the matter—whether there was fraud in the inducement—and posits that when one party expressly acknowledges not relying on any representation of the other in connection with a specific aspect of the contract, there cannot have been fraud in the inducement, at least regarding that aspect. Both approaches have elements to commend them—the Texas approach helps assure the overall validity of the contract, whereas the *Danann* rule directly militates against the possibility of fraud in the inducement.

Whether to enforce a disclaimer of reliance clause implicates two important legal policies—promoting certainty in contracts on the one hand, and discouraging fraud on the other. Exalting either objective at the expense of the other is unnecessary, because it is possible to strike a balance that serves both. The following formulation strikes such a balance: a disclaimer of reliance provision, coupled with a merger provision, bars a subsequent claim of

12

fraud in the inducement regarding the precise subject matter of the disclaimer, provided the circumstances of the making of the contract justify enforcing the disclaimer. That approach incorporates both the Texas formula and the *Danann* rule.

3. The Operative Principles Applied to the Facts in this Case

Applying those principles to the undisputed facts of this case, the court concludes that this case plainly falls within the *Danann* rule. Plaintiffs' fraudulent inducement claim is that, in agreeing to sell their shares for eight million dollars, they relied on statements by Richard Dyke and other Officer/Director Defendants concerning the value of the company and, by implication, the value of Plaintiffs' shares. In the Stock Purchase Agreement, the Plaintiffs acknowledged the opposite—that they had "not relied on Purchaser or any of its directors, officers, shareholders, employees or agents with respect to any assessment of the value of Purchaser or the Shares being sold by such Seller hereunder or the advisability of entering into this Agreement or the transactions contemplated by it . . ."

Plainly, "the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations" in this case as in *Danann*. The undisputed facts and circumstances also satisfy the Texas criteria—

- the terms of the contract were negotiated, rather than boilerplate;

- during negotiations the parties specifically discussed whether the Plaintiffs were entitled to rely on the Defendants in valuing their shares and deciding whether to sell;

- the Plaintiffs were represented by counsel;

- the parties dealt with each other in an arm's length transaction, namely the settlement of a lawsuit;

- the parties were knowledgeable in business matters; and

- the language of the operative contractual provisions—meaning in this instance the disclaimer provision, the merger provision and the releases of liability—is clear.

13

Significantly, however, neither *Danann* nor the Texas cases involved contracts between fiduciaries and the principals to whom the fiduciary duties are owed. Plaintiffs suggest that this makes all the difference—specifically they argue that the fiduciary relationship means that the settlement among the Plaintiffs and their fiduciaries, the Dykes and Faraday, was not and could not have been an arms-length transaction.

The Plaintiffs' position appears to be that a disclaimer of reliance provision can never operate to bar a subsequent fraud in the inducement claim against a fiduciary. At oral argument, Plaintiffs' counsel was asked in substance what could have been included in the documents to render the settlement sufficient to bar Plaintiffs' fraud claims. Counsel for Plaintiffs answered, in effect, that no additional language or other ingredient would suffice—a disclaimer of reliance clause can never prevent a subsequent fraud claim against a fiduciary, because the principal is always entitled to rely on the fiduciary. Defendants say that such cannot be the law—it must be possible for a fiduciary who is sued by a principal for breach of fiduciary duty to purchase finality and peace through a settlement of claims, and the settlement documents in this case must be interpreted to achieve such a result.

This court agrees with the Plaintiffs that the fiduciary relationship is a critical factor that distinguishes this case from others. However, the court does not agree with the Plaintiffs' premise that no disclaimer of reliance clause can prevent a principal from claiming to have relied on a fiduciary in a subsequent fraud in the inducement claim. Although the fact that this contract involved fiduciaries does set this case apart from the *Danann* and Texas lines of cases, the fact that this contract was part of a settlement of litigation instituted by the principals against the fiduciaries brings this case back within the scope of that precedent.

For the same reason, this case implicates a further legal—perhaps even jurisprudential—policy beyond those of promoting certainty of contracts and discouraging

14

fraud: the policy favoring finality in litigation, whether resolved through judgment or through a settlement. *See, e.g., Dewhurst v. Dewhurst,* 2010 ME 99, ¶ 11, 5 A.3d 23, 26 (addressing finality of judgments through recordation of an agreement after a judicially assisted settlement conference); *Keybank Nat'l Ass'n v. Sargent,* 2000 ME 153, ¶ 15, 758 A.2d 528, 533 ("It is necessary that judgments, especially those settling property rights . . . have a high degree of stability and finality." (quotation marks omitted)).

The disclaimer of reliance clause in this case was not part of an ordinary business transaction, but part of a settlement of claims against the very fiduciaries upon whom the Plaintiffs purport to have relied, notwithstanding their warranty disclaiming reliance. The fact that the Plaintiffs, as principals, had sued the fiduciaries, and the further fact that the contract at issue was to settle the litigation, means that the fiduciary relationship existed only in form. The litigation context removed any question about the settlement being an arms-length transaction.

For all of these reasons, the court concludes that the disclaimer of reliance provision in the Stock Purchase Agreement, coupled with the merger clause, is binding against the Plaintiffs, as an acknowledgment that Plaintiffs did not sell their stock in reliance on any statement, act, or omission, of any of the Defendants. Therefore, under the rule stated at the outset, Plaintiffs will not be permitted to contradict their acknowledged disclaimer of reliance, and the court will not consider their affidavits to the effect that they did in fact rely on the Defendants in valuing their shares and deciding to sell. Summary judgment in Defendants' favor on Plaintiffs' fraud claim in Count III is therefore warranted.

4.    The Effect on Plaintiffs' Claims of Enforcing the Disclaimer of Reliance Provision

The last step in the analysis is to determine the effect on Plaintiffs' claims of enforcing the disclaimer of reliance clause in concert with the merger clause on the remainder of their

15

claims against the Defendants. Plaintiffs argue that, even if the disclaimer clause and other provisions are interpreted to bar their fraud claims, their other claims should be allowed to proceed. The effect of enforcing the disclaimer of reliance is clearest with regard to the fraud claims because detrimental reliance is explicitly made an element of any fraud claim.

However, given that the loss they claim to have suffered resulted from the sale of their shares to Bushmaster, Plaintiffs will have to prove that the Defendants' alleged wrongful acts caused them to sell their shares. The court sees no way for the Plaintiffs to meet their burden on any of their claims without asserting that they relied on the Defendants in deciding to sell their stock.

On their breach of fiduciary duty claims in Counts I and II in the Amended Complaint, Plaintiffs cannot recover unless they prove that a breach of fiduciary duty by one or more of the Defendants caused their loss by inducing them to sell their shares at less than true value. On their unjust enrichment claim in Count IV of the Amended Complaint, the Plaintiffs cannot prove that any enrichment of the Defendants at Plaintiffs' expense was unjust without proving that the Defendants induced Plaintiffs in some way to sell their shares for less than their true value. On their intentional/negligent infliction of emotional distress claims in Count V, the Plaintiffs cannot recover without proof that the Defendants caused the emotional distress by defrauding the Plaintiffs. Moreover, the Plaintiffs have not established severe emotional distress in the summary judgment record, and thus have not made out a prime facie case of either cause of action. *See Reliance Nat'l Indem.*, 2005 ME 29, ¶ 9, 868 A.2d at 224-25. Finally, the rescission claim in Count VI is an equitable remedy that depends on proof of liability on one or more of the previous counts.[9] Because Defendants are entitled to summary judgment on

_____

[9] Moreover, because rescission is practically impossible to effectuate, Defendants would be granted summary judgment on Count VI even had it been denied on the other counts. Rescission would require the Plaintiffs to return to Bushmaster the amount they received for their shares and would require

16

those counts, they are also entitled to summary judgment on Count VI.

The court likewise grants summary judgment in favor of Bangor Savings Bank on Count VI, the only count alleged against them, because they are not alleged to have engaged in any wrongdoing and the funds they are alleged to hold in trust are not available to Plaintiffs in light of the unavailability of rescission.

For these reasons, the court concludes that if the Plaintiffs cannot claim to have relied on the Defendants in valuing their shares and deciding to sell, the Plaintiffs will not be able to prove that the Defendants caused any of the loss for which the Plaintiffs seek to recover in their Amended Complaint.

It is hereby ORDERED AS FOLLOWS:

(1) Defendants' Motion for Summary Judgment, and Bangor Savings Bank's Motion for Summary Judgment, are both granted.

(2) The clerk shall enter judgment for all the Defendants on all counts of the Amended Complaint.

(3) An award of costs is deferred to entry of final judgment. The clerk will schedule a conference of counsel regarding further proceedings.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated 14 September 2011

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 9.15.2011
Copies sent via Mail ___ Electronically ✓

---

Bushmaster to restore their shares to them. Given that Bushmaster does not exist, and also given that the Plaintiffs waited five years to seek rescission, the court in its discretion would withhold this equitable remedy. *See Ficek v. Coastal Harbors, Inc.*, 658 A.2d 1055, 1056 (Me. 1995) (trial court's discretion to deny rescission).