**2009 ME 101**

**BLUE STAR CORPORATION**

v.

**CKF PROPERTIES, LLC, et al.**

Supreme Judicial Court of Maine.

Submitted On Briefs: July 8, 2009.

Decided: Sept. 24, 2009.

**1272**

Thomas Hallett, Esq., David A. Weyrens, Esq., The Hallett Law Firm, Portland, ME, for Blue Star Corporation.

Brendan P. Rielly, Esq., Jensen, Baird, Gardner & Henry, Portland, ME, for CKF Properties, LLC.

Panel: ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Blue Star Corporation appeals, and CKF Properties, LLC, cross-appeals, from a summary judgment of the Superior Court (Cumberland County, *Delahanty, J.*): (1) in favor of Blue Star on its claim for breach of contract against CKF; (2) in favor of CKF on Blue Star's claim for lost profits damages resulting from the breach; and (3) in favor of CKF's president, Timothy Flannery, as to all claims against him individually.

[¶ 2] CKF argues that Blue Star waived, or was equitably estopped from asserting, its claim for breach of contract. Blue Star argues that: (1) genuine issues of fact remain regarding (i) its claim for lost profits damages, and (ii) Flannery's individual liability for CKF's breach of contract; and (2) the court erred in ruling in limine that evidence regarding interest and insurance payments incurred by Blue Star was irrelevant to the breach. Because there remain genuine issues as to material facts regarding Flannery's indi-

vidual liability for the breach of contract, we vacate that portion of the judgment. In all other respects, the judgment will be affirmed.

## I. CASE HISTORY

[¶ 3] The parties' statements of material facts indicate the following undisputed facts, except as indicated. Timothy Flannery was the president and sole owner of CKF. The only asset CKF owned was the former Sebago Moc Mill in Westbrook. On April 17, 2006, Blue Star, through its president Nicholas Kampf, and CKF, through its principal and sole member Timothy Flannery, signed a purchase and sale agreement in which Blue Star agreed to purchase the Sebago Moc Mill from CKF. Paragraph 21(c) of the agreement imposed an obligation on CKF to secure removal of tenants then occupying the mill within forty-five days after closing on the property. Paragraph 21(c) stated:

> c. Purchase of the Property is contingent on the Property being free of any tenants in possession no later than 45 days after Closing. Seller shall obtain a binding commitment from any tenants to quit the Property on or before said 45th day following closing. If Seller is unable to obtain such binding commitments from each tenant within 45 days of the Effective Date, Purchaser may declare the Contract null and void by notifying Seller in writing, and said earnest money shall be returned to Purchaser, whereupon this agreement shall terminate. Seller may relocate tenants to any other property at any time during the term of this agreement or. [*sic*] Seller shall indemnify Purchaser for any loss suffered as a result of any holdover by a tenant beyond the 45th day after Closing.

[¶ 4] Kampf planned to convert the mill into residential condominiums or apartments. After unsuccessful attempts to secure bank financing for both the ac-

quisition and the redevelopment of the property, Blue Star pursued private financing for the project. To that end, Blue Star approached Alpine Realty Corporation. Alpine agreed to provide acquisition financing for the project, but did not commit to finance the redevelopment of the mill. Subsequently, Blue Star approached Pioneer Capital Corporation, seeking redevelopment financing. Because Blue Star's request exceeded Pioneer's lending capabilities, Pioneer contacted Greystone USA to gauge Greystone's interest in serving as a funding partner on the project with Pioneer. Redevelopment financing was discussed in September 2006, but no agreement was reached at that time.

[¶ 5] Blue Star and CKF closed on the property on August 18, 2006. At closing, both parties reaffirmed the rights and obligations contained in paragraph 21(c)—the holdover tenant provision—of the agreement. Pursuant to this provision, CKF was obligated to remove all tenants from the premises by October 2, 2006.

[¶ 6] At the time of the closing, two tenants remained on the property: F.A.W., Inc., d/b/a Postal Express, and Corporate Purchasing Resources, Inc (CPR). Postal Express was a tenant at will for a portion of the premises and was under a lease for another portion of the premises that it had assumed from a previous tenant well before the closing date. CPR was also a tenant at will.

[¶ 7] Soon after the closing, Flannery, acting for CKF, contacted both tenants and informed them that, as a result of the sale to Blue Star, they were required to vacate the premises by October 2, 2006. Nevertheless, on August 24, 2006, Flannery, for CKF, signed a side agreement with Postal Express indicating that its tenancy could terminate on October 31, 2006, or later if renovations to another Flannery-controlled property, to which Postal

Express was relocating, were not complete. Both Postal Express and CPR paid rent to Flannery for the month of October and remained on the premises after October 2, 2006.

[¶ 8] On October 16, after becoming aware of the presence of the two holdover tenants, Kampf changed the locks on the property. Thereafter, the owner of Postal Express held a press conference regarding the lock-out and stated that Postal Express had a lease until the following year and that "Kampf recently purchased the building and under contract must honor the leases in place." This was the first time that Kampf learned of the side agreement between Postal Express and Flannery extending the existing lease until October 31 or later. A local television station reported the press conference on television and on its website and identified Kampf as an individual who may be subject to criminal charges as a result of a highly-publicized family situation unrelated to the mill purchase.

[¶ 9] Following the press conference, both CPR and Postal Express were allowed back on the premises. At that time, counsel for CPR and Blue Star communicated regarding CPR's continued presence at the mill, although the parties dispute the substance of those conversations. CKF alleges that CPR and Blue Star attempted to negotiate a short-term extension of their lease. Blue Star asserts that no such negotiation occurred and that it did not want holdover tenants.

[¶ 10] Representatives of Pioneer and Greystone saw the news reports of the press conference, including the reference to Kampf's pending criminal charges. Based on Kampf's notoriety, the Greystone loan committee rejected Blue Star's request for financing. Greystone then indicated to Pioneer that to even consider financing, Blue Star would need to sell the property at arm's length to an unrelated third party.

[¶ 11] Blue Star did not consider this option because, by the third week of October 2006, Kampf had decided to sell the property and forgo redevelopment. Postal Express vacated the property by October 31, 2006, and CPR vacated the property around November 14, 2006. Blue Star sold the property to the Westbrook Housing Authority in April 2007, for $2,000,000, resulting in an approximate $900,000 profit for Blue Star.

[¶ 12] In August 2007, Blue Star filed a complaint against CKF and Flannery alleging breach of contract, negligence, and fraud arising out of the side agreement and holdover tenancies of CPR and Postal Express. Blue Star alleged that the failure of CKF and Flannery to ensure that the property was vacated by October 2, 2006, constituted a material breach of the purchase and sale agreement, that CKF had permitted the tenants to stay past that date, and that the presence of the remaining tenants disrupted the redevelopment plan and ultimately resulted in the loss of the redevelopment financing. Among its damages claims, Blue Star sought: (1) the difference between the profit realized by Blue Star from its sale of the undeveloped property and the earnings that would have been realized had the development plan been completed; (2) security and operating costs resulting from the holdover tenancies; (3) interest and insurance costs incurred on the property; and (4) attorney fees.

[¶ 13] CKF answered the complaint. Flannery filed a motion to dismiss the claims against him individually. The court denied Flannery's motion to dismiss concluding that, although Flannery was not a party to the purchase and sale agreement between Blue Star and CKF, he could be held personally liable if Blue Star was able

to demonstrate that he fraudulently entered into the contract on behalf of CKF.

[¶ 14] A discovery deadline was set for May 2008. In its answers to CKF's first set of interrogatories, Blue Star indicated that Alpine Realty provided the acquisition loan for the mill and was "considering providing or assisting in obtaining the construction loan Blue Star was seeking for the property, but they were not interested in providing construction financing as of mid-October due to the complications presented by the holdover tenant issues and the publicity surrounding these issues." Blue Star also indicated that Kampf's in-laws provided additional acquisition financing.

[¶ 15] In discovery, Blue Star initially did not list the in-laws as persons having knowledge of facts relevant to Blue Star's complaint or as possible sources of redevelopment financing. Blue Star designated Art Girard of Alpine Realty as an expert and indicated that he would testify that Alpine Realty would "more likely than not" have provided redevelopment financing for the project but for the issues surrounding the holdover tenants.

[¶ 16] Blue Star moved for partial summary judgment on the issue of liability on its breach of contract and negligence claims. Flannery and CKF also designated Girard as an expert, indicating that Girard would testify that the presence of tenants on the property after the deadline set by the purchase and sale agreement played no part in his decision not to provide redevelopment financing for the project.

[¶ 17] CKF and Flannery filed a cross-motion for summary judgment on all claims, arguing primarily that Blue Star had waived its claims for breach of contract by allowing the holdover tenants to remain on the premises and that no issues of fact existed regarding Flannery's personal liability or damages. In support of this motion, CKF filed an affidavit by Girard indicating that he had never been interested in financing the redevelopment of the property because it was not the type of project with which he was typically associated. Girard further stated that he told Kampf several times that he was not interested in redevelopment financing, beginning in the spring of 2006 when he agreed to finance the acquisition of the mill, and that the presence of tenants beyond the date specified in the purchase and sale agreement played no part in his decision not to finance the development. CKF also filed affidavits from Pioneer and Greystone indicating that the holdover tenant situation had no impact on their decisions to deny redevelopment financing for the project.

[¶ 18] Blue Star then filed a motion, pursuant to M.R. Civ. P. 56(f), seeking to enlarge the time allotted to file its opposition to CKF's motion for summary judgment in order to permit additional depositions. The court denied the motion to enlarge, based on its conclusion that Blue Star had not identified any specific facts it expected to develop through depositions or how the testimony would impact the outcome of CKF's motion for summary judgment. Accordingly, the court ordered Blue Star to respond to CKF's motion for summary judgment. The court also denied Blue Star's motion for partial summary judgment, concluding that: (1) factual disputes remained regarding whether Blue Star's actions following the tenant press conference operated as a waiver of the breach of contract claim; and (2) Blue Star had failed to demonstrate that CKF owed a duty of care to Blue Star on its negligence claim.

[¶ 19] Blue Star timely filed its opposition to CKF's motion for summary judgment. Included with Blue Star's opposition was an affidavit from Kampf, alleging

for the first time that his father-in-law would have financed the redevelopment, but declined based on the "potential for delay and loss posed by the tenants." Also included was an affidavit by Kampf's father-in-law, indicating that, after discussions with Kampf in September and October 2006, he told Kampf that he would finance the redevelopment if asked, but that after the tenant press conference, he was no longer interested in financing the project due to "the potential for delay and loss represented by the tenants."

[¶ 20] After a hearing, the court granted summary judgment in favor of Blue Star on its breach of contract claim, but limited the available damages resulting from the breach to consequential and incidental damages. The court granted summary judgment in favor of CKF on the issue of lost profits damages resulting from the loss of redevelopment financing, concluding that Blue Star failed to generate a factual issue as to whether CKF's breach resulted in the failure to obtain the financing.

[¶ 21] The court further concluded that Kampf's deposition testimony that Girard told him it "looked like" he would finance the redevelopment in early October, even if true, was insufficient to generate a factual issue regarding whether Girard would have provided the financing but for CKF's breach. Finally, the court entered summary judgment without comment in favor of Flannery on all claims against him individually.

[¶ 22] Following the court's order, CKF filed a series of motions in limine seeking to exclude evidence regarding Blue Star's claims for damages resulting from: (1) interest it paid on acquisition financing; (2) insurance payments made on the property; (3) costs relating to the attempted eviction of CPR and Postal Express; and (4) attorney fees. The court excluded evidence relating to insurance and interest payments, concluding that neither were relevant to CKF's breach, and denied CKF's remaining motions. The court granted Blue Star's oral motion to dismiss its remaining claims and entered a final judgment on October 28, 2008. Blue Star and CKF each timely appealed.

## II. LEGAL ANALYSIS

 [¶ 23] Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute. *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825; *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174. On appeal, when each side challenges trial court rulings on motions for summary judgment, we review the record on each summary judgment issue presented on appeal most favorably to the party objecting to the grant of summary judgment on that issue. Summary judgment may be affirmed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, referred to in the statements [of material facts] show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." M.R. Civ. P. 56(c).

### A. Waiver and Equitable Estoppel

[¶ 24] CKF argues that, by permitting CPR to remain on the premises past October 2, 2006, Blue Star approved the continued tenancies of both CPR and Postal Express and thus waived its right to enforce that date through its breach of contract claim. CKF further asserts that equitable estoppel applies to the breach of

contract claim because CKF and Flannery justifiably relied upon Blue Star's actions and statements permitting the continuing tenancies, and that such reliance was to its detriment because of the subsequent exposure to liability and legal fees.

[¶ 25] In order for CKF to avoid summary judgment on the basis of its affirmative defenses of waiver and equitable estoppel, CKF must demonstrate that the summary judgment record contains disputed issues of fact to generate these defenses. *See Kirkham v. Hansen*, 583 A.2d 1026, 1027 (Me.1990).

[¶ 26] Waiver is "a voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party." *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 919 (Me.1976) (citations omitted). If a party in knowing possession of a right acts inconsistently with the right or that party's intention to rely on it, the right is deemed waived. *Id.* "To bar enforcement of a known right, the waiver, however established, must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights." *Id.*

[¶ 27] Equitable estoppel "precludes a party from asserting rights which might perhaps have otherwise existed ... against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right." *Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630, 635 (quotation marks omitted). Equitable estoppel requires a misrepresentation that "may arise through a combination of misleading statements, conduct, or silence." *Id.* ¶ 18, 964 A.2d at 636.

[¶ 28] CKF's argument that Blue Star waived, or is equitably estopped from asserting, its claim of breach of contract is based upon its factual allegations that, following the attempted lockout at the mill on October 16, Blue Star: (1) attempted to negotiate a short term lease with CPR; (2) indicated to CPR on several occasions that there was no urgency that CPR vacate the premises and that Kampf could work around CPR while redeveloping the property; and (3) permitted both Postal Express and CPR to remain on the premises until they voluntarily vacated on October 31 and mid-November, respectively.

[¶ 29] Despite the factual disputes between the parties regarding the events following the mid-October lockout, CKF has failed to allege facts that, even if true, would generate a successful defense based on either waiver or equitable estoppel. The actions that CKF alleges were taken by Blue Star in permitting the tenants to remain on the premises do not amount to either "a voluntary or intentional relinquishment of a known right," *see Interstate*, 355 A.2d at 919, or a misrepresentation inducing good faith reliance on the part of CKF. CKF does not dispute that Blue Star permitted the holdover tenancies precisely because it *intended* to enforce its rights through the purchase and sale agreement and seek damages from CKF for the breach, and that it unequivocally alerted CKF to that course of action. The parties agree that no lease extension was reached between Blue Star and either holdover tenant and that Flannery received rents from the holdover tenants during the holdover period. In this circumstance, CKF has not alleged facts indicating that Blue Star at any time acted inconsistently with its contractual rights to seek damages from CKF resulting from the breach. The doctrines of waiver and equitable estoppel do not provide defenses to the Blue Star breach of contract claim.

## B. Lost Profits

■ [¶ 30] Blue Star argues that the proposed testimony that Kampf's father-in-law would have provided redevelopment financing but for the holdover tenancies, disclosed prior to the close of discovery, amounted to an elaboration rather than a contradiction of Kampf's earlier testimony regarding potential redevelopment financing that omitted any references to in-laws.

■ [¶ 31] We have stated that "a party will not be permitted to create an issue of material fact in order to defeat a summary judgment motion simply by submitting an affidavit disputing his own prior sworn testimony." *Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733, 735. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Id.* (quotation marks omitted).

[¶ 32] In *Zip Lube*, we affirmed a trial court's refusal to consider an affidavit filed in opposition to summary judgment averring that the plaintiff relied on assurances from a bank representative *prior* to refusing to deal with a debtor, when the affidavit contradicted the plaintiff's earlier deposition testimony that his refusal to deal with a debtor was expressed to the debtor *before* he had notified the bank of the debtor's offer. *Id.* ¶¶ 9–10, 709 A.2d at 735. We applied *Zip Lube* to a party's affidavit alleging reliance on representations that a broker agreement had been terminated, that contradicted deposition testimony indicating an acknowledgement that the agreement may still be in force, *Holden v. Weinschenk*, 1998 ME 185, ¶ 12, 715 A.2d 915, 919, and to a party's affirmation that her legal expenses amounted to $3000, contradicting prior sworn testimony that the expenses were over $15,000,

*Schindler v. Nilsen*, 2001 ME 58, ¶ 9, 770 A.2d 638, 641–42.

[¶ 33] In this case, the father-in-law's role as a potential source of redevelopment funds fell squarely within the scope of the discovery questions posed by CKF that unambiguously sought disclosure of all individuals and communications relevant to the issue of redevelopment financing. In this circumstance, the court properly treated the late disclosure of the father-in-law's evidence as contradictory to Kampf's earlier deposition and interrogatory responses. *See Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 55 (1st Cir. 2000) ("We think that in the present case the district court was entitled to disregard any completely new incident that [the plaintiff] described for the first time in her affidavit, assuming that prior questions had clearly asked for such information.").

[¶ 34] Both the father-in-law's asserted interest in the litigation and the timing of the disclosure implicate the policy underlying the rule articulated in *Zip Lube* that prevents the introduction of contradictory affidavits solely for the purpose of generating factual issues when none exist. The Superior Court did not err in disregarding the father-in-law's affidavit for summary judgment purposes.

■ [¶ 35] Blue Star also contends that, viewed in the light most favorable to it, the competing versions of Girard's intentions regarding redevelopment financing generated a factual issue regarding pecuniary damages. Blue Star argues that Kampf's interrogatory responses and expert designation, indicating that Girard was prepared to provide redevelopment financing absent the circumstances surrounding the holdover tenants, directly contradict Girard's own affidavit submitted with CKF's motion for summary judgment, and that a jury is the proper entity to resolve that contradiction. In addition, Blue Star contends that a jury could con-

clude that, but for the holdover tenants, Kampf could have begun development on schedule and prior to any financing, given his experience as a developer.

[¶ 36] The Superior Court did not err in determining that, absent the father-in-law's affidavit, no genuine issue of material fact existed regarding damages in the form of lost redevelopment financing resulting from CKF's breach. Blue Star does not dispute CKF's factual assertions that both Pioneer and Greystone. declined to finance the project based on Kampf's notoriety. Girard, the only other potential financier who was identified by Blue Star, offered affidavit testimony in support of CKF's motion for summary judgment that: (1) Girard specifically told Kampf during his visit to the mill in the spring of 2006 that he was not interested in providing redevelopment financing because he did not generally engage in that type of lending or development; (2) Kampf called Girard three times after the loan closing to ascertain if Girard had changed his mind and Girard assured Kampf that he had not; and (3) the presence of the holdover tenants played no role in Girard's decision not to provide redevelopment financing.

[¶ 37] Kampf denies these assertions, alleging that: (1) Girard told Kampf during the site visit in July 2006 that he was interested in providing a redevelopment loan but would not be willing to discuss it until after closing on the acquisition financing; (2) in October 2006, Girard told Kampf that "it looked like he would do the development loan";[1] and (3) following the tenant press conference, Girard indicated that he was no longer interested in rede-

velopment financing due to the ongoing tenant dispute.

[¶ 38] Contrary to Blue Star's assertions, the cited portions of Kampf's deposition do not create a factual issue regarding lost profits damages. Even if Kampf's version of the discussions with Girard was true, he characterized Girard's interest as equivocal and dependent on other factors. Kampf's testimony that Girard thought that it "looked like a good loan" does not equate to a loan commitment. Kampf's bare assertion that Girard indicated that he would not make the loan because of the tenant dispute, without a prior agreement, verbal or otherwise, to provide the financing, does not create a triable issue on lost profits damages, particularly given Girard's directly contradictory account. *See Beaulieu v. Aube Corp.*, 2002 ME 79, ¶ 31, 796 A.2d 683, 692 ("When there is so little evidence tending to show a critical element of a plaintiff's claim that the jury would have to speculate in order to return a verdict for the plaintiff, a defendant is entitled to a summary judgment").

## C. Interest and Insurance Payments

[¶ 39] Blue Star argues that, during the eight months that it owned the mill before selling the mill to mitigate its damages, it could not redevelop the property as planned because of CKF's breach, and therefore the mortgage interest and construction insurance incurred by Blue Star during that period are recoverable. Blue Star asserts that, at a minimum, a jury could reasonably decide to award it such costs for the seven-week period that the tenants remained on the premises.[2]

---

**1.** As highlighted by CKF, the assertion that Girard indicated that "it looked like he would do the loan" differs from the record citation to Kampf's deposition, in which he testified that "[Girard] looked at things and said that there are different possibilities in terms of whether he would lend the money or he would borrow and things of that nature, but,

you know, he wanted to see the final detail of that and—but other than that, it was a—*it looked like a good loan"* (emphasis added).

**2.** Blue Star characterizes the court's orders excluding the evidence of insurance and interest payments as contradictory to its order on summary judgment, in which the court stated:

The court excluded evidence relating to Blue Star's claim for both mortgage interest payments and insurance costs on the basis that neither cost was relevant to CKF's breach—the failure to remove Postal Express and CPR from the premises as required under the purchase and sale agreement.

**** [¶ 40] We review a trial court's determination regarding the relevancy of evidence for clear error and the ultimate decision to consider or exclude evidence, subject to other challenges, for an abuse of discretion. *Frustaci v. City of S. Portland*, 2005 ME 101, ¶ 13, 879 A.2d 1001, 1006.

[¶ 41] The claims regarding mortgage interest and insurance payments depend on the same theory that the court rejected on summary judgment with respect to lost profits damages, specifically that the presence of the holdover tenants prevented Blue Star from developing the property. Given the lack of disputed factual issues regarding a connection between CKF's breach and Blue Star's failure to develop the property, the exclusion of this evidence was within the court's discretion.

## D. Individual Liability of Flannery

[¶ 42] Blue Star argues that it presented sufficient evidence that Flannery operated CKF as his alter-ego and that, because it has no meaningful recourse against CKF as a corporate entity, an unjust or inequitable result would result if the court refused to pierce the corporate veil and hold Flannery liable for CKF's breach. Blue Star further contends that Flannery's statement that he would remove all tenants pursuant to the purchase and sale agreement was fraudulent given the side agreement signed after the closing permitting Postal Express to remain on

the premises past the agreed date, and that fraudulent intent is a question of fact that can only be resolved by a jury.

**** [¶ 43] To pierce the corporate veil and disregard the corporate entity, a plaintiff must establish that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence. *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 10, 901 A.2d 189, 194–95; *State v. Weinschenk*, 2005 ME 28, ¶ 19, 868 A.2d 200, 207. Whether the corporate form should be disregarded involves questions of fact for a fact-finder to decide. *Advanced Constr.*, 2006 ME 84, ¶ 10, 901 A.2d at 195.

**** [¶ 44] Separate from the issue of piercing the corporate veil, "[c]orporate officers who participate in wrongful acts can be held liable for their individual acts, and such liability is distinct from piercing the corporate veil.... The individual liability stems from participation in a wrongful act, and not from facts that must be found in order to pierce the corporate veil." *Id.* ¶ 13, 901 A.2d at 195 (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978)). This also is a fact question for the fact-finder to decide.

**** [¶ 45] In deciding whether, with the record evidence considered most favorably to Blue Star, there are any disputes of material facts that would support piercing the corporate veil or finding that Flannery participated in a wrongful act causing harm to Blue Star, the record demonstrates the following.

[¶ 46] First, Flannery negotiated and signed the purchase and sale agreement including the requirement that he secure commitments from tenants to quit the

---

"Blue Star has presented sufficient evidence that the breach resulted in damages other than lost profits due to a loss of financing."

premises within forty-five days after closing, and he reaffirmed that requirement at closing. Second, the week after the closing, Flannery entered into the side agreement, allowing one tenant to remain on the premises after the agreed time when the premises were to be free of tenants, and he received the rent paid by both tenants for the holdover period. Third, Flannery completely owned and controlled CKF, which was formed solely for the purpose of owning the Sebago Moc Mill, and the mill was CKF's only asset. Fourth, Flannery admitted at his deposition that he had rendered CKF judgment-proof because he had spent the $450,000 proceeds of the sale and any other assets of CKF and could not recall how the funds were spent.

[¶ 47] These facts, taken in conjunction, indicate a genuine issue of material fact regarding whether: (1) Flannery was CKF's "alter-ego" and that Flannery abused the corporate form through CKF; and (2) limiting Blue Star's recovery to the assets of the judgment-proof CKF would lead to an unjust or inequitable result. Separately, these facts indicate a genuine issue of material fact regarding whether Flannery participated in a wrongful act by engaging in a fraud or promoting a breach of the purchase and sale agreement by signing the side agreement that directly frustrated compliance with the tenant clearance provision of the Blue Star–CKF contract.

[¶ 48] These unresolved factual issues that must be decided at trial preclude deciding by summary judgment that: (1) the CKF corporate veil cannot be pierced; or (2) even if the corporate veil is not to be pierced, Flannery cannot be held individually liable for participation in wrongful acts causing damage to Blue Star. *See Advanced Constr.*, 2006 ME 84, ¶¶ 10–13, 901 A.2d at 194–95. Accordingly, we must vacate the summary judgment in favor of Flannery on the individual liability claims.

23 The entry is:

The judgment in favor of Timothy Flannery on the issue of personal liability is vacated. The judgment is affirmed in all other respects. No costs to either party. Remanded for further proceedings consistent with this opinion.