STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Androscoggin, ss.                                    Docket No. BCD-CV-11-26
                                                     AMH  -AND-  11/9/2011


FORTUNE COMMUNICATIONS, INC.
d/b/a Fortune Consulting

                        Plaintiff

                          v.

CENTRAL MAINE HEALTHCARE CORPORATION

                        Defendant

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The motion for summary judgment of Defendant Central Maine Healthcare Corporation

(CMHC) came before the court for oral argument November 3, 2011.

*Background Facts*

The salient undisputed facts are set forth in detail in the parties' summary judgment

filings and will only be summarized here, based on those filings.[1]   Plaintiff Fortune

Communications, Inc. (Fortune), doing business as Fortune Consulting, provides consulting

services to other businesses on telecommunications issues, including "telecommunications

audits," which entail a review of the clients' telecommunications systems and networks to

promote efficiency, eliminate errors and reduce costs.  CMHC is an organization in the health

care field with its principal offices in Androscoggin County, Maine.

In early 2009, Frank DiMascola, a vice-president of Fortune, contacted CMHC

regarding the possibility of Fortune being retained to perform telecommunications consulting

and/or auditing services for CMHC.  In April 2009 and again in May 2009, Mr. DiMascola met

---

[1]  This summary of facts applies only to the summary judgment procedure.

1

with representatives of CMHC to discuss the services Fortune could provide to CMHC. In the course of those meetings, he gave representatives of CMHC brochures of materials regarding Fortune, including descriptions of Fortune's services, its procedures for providing services, client information and a sample copy of Fortune's standard form services agreement, titled Telecommunications Audi and Services Analysis Letter of Agreement (the "Letter of Agreement"). Also included in the brochure was a "Statement of Confidentiality" that Mr. DiMascola drafted two years before and began including in the Fortune brochure to help protect materials in the brochure as confidential. He did so in response to seeing potential customers use information in the brochure for their own benefit without Fortune's permission.

In the course of the April and May 2009 meetings, Mr. DiMascola went over the materials in the brochure with the CMHC representatives, and read the Statement of Confidentiality to them. The Statement of Confidentiality reads in full: "The materials contained herein, the attachments, and their contents are considered to be the proprietary materials of Fortune Consulting and shall not be used, in whole or in part, by any agent, client or prospect, without the expressed written consent of Fortune Consulting." The record does not reflect any specific response by representatives of CMHC to the Statement of Confidentiality, so there is no indication that they expressly agreed to it or rejected it, apart from whatever might be inferred from their apparent lack of response after hearing it read to them.

The discussions continued, at least via e-mail, through 2009. On June 18, 2009, Mr. DiMascola sent an e-mail message to Denis Tanguay, director of CMHC information technology department, and one of the CMHC representatives Mr. DiMascola had met with in May. Attached electronically to the message was a modified version of the Telecommunications Audi and Services Analysis Letter of Agreement included in the brochure of materials that Mr. DiMascola had provided and read to Mr. Tanguay and others in May. The modifications were

2

limited to inserting the name of an affiliate of CMHC in the blank space for the name of "Client" and to substitute a different signer's name for Fortune. However, nothing in the e-mail message or the attached document referred back to the Statement of Confidentiality or otherwise suggested that the attachment contained confidential, proprietary or trade secret information.

In July 2009, there was a further meeting between representatives of the parties, and after that meeting, on July 23 Mr. DiMascola sent another e-mail message to Mr. Tanguay, again attaching the Letter of Agreement with further modifications. Again, nothing in the message or the attachment mentioned the Statement of Confidentiality or otherwise suggested that the attachment contained confidential, proprietary or trade secret information.

During the fall of 2009, Mr. DiMascola repeatedly contacted CMHC, in an unsuccessful effort to find out where the potential agreement for CMHC to retain Fortune stood. Meanwhile CMHC had made an internal decision to put its telecommunications audit requirements out to bid. Mr. Tanguay prepared a Request for Proposals to be circulated among potential bidders, including Fortune.

In doing so, he copied four paragraphs from the Letter Agreement draft that Mr. DiMascola had sent to him as an attachment to the July 23 e-mail message. The four paragraphs also appear in the Letter of Agreement draft sent by Mr. DiMascola via e-mail in June as well as in the sample contained in the Fortune brochure that Mr. DiMascola had provided and explained to CMHC representatives in April and May.

The paragraphs as they appear in all three versions of the Letter Agreement describe tasks Fortune—referred to as FC in the Letter of Agreement—performs in the course of a telecommunications audit. The four paragraphs and the prefatory sentence read as follows in all three versions of the Letter Agreement:

The Audit will include, at minimum, the following tasks and activities based on Customer Service Records, invoice and configuration details provided by the Client and/or their service providers and vendors upon commencement of the Audit:

1. Compare Client's current monthly billing against service provider/vendor agreements, identify billing anomalies, pursue recovery of any over payments, and work with service providers/vendors to prevent the identified issue(s) from recurring.
2. Based on our preliminary analysis of systems, networks and service configurations, provide high level optimization recommendations. These recommendations will be based on our then current understanding of the Client's network environment. Any additional detailed analysis that may be required/requested by the Client is available from FC under a separate professional services agreement.
3. Analysis results will be provided to the Client in writing with supporting documentation. All proprietary information provided by the Client used during the course of this Audit will be held in strict confidence by FC.
4. Upon Client's receipt of service provider/vendor invoicing that was modified as a result of the Audit, FC will validate that all modifications were implemented properly. Should the Client require additional billing resolution assistance, FC can provide this service under a separate professional services agreement.

The RFP drafted by Mr. Tanguay for CMHC adopted only the Letter Agreement's first numbered paragraph verbatim. The RFP includes Fortune's second numbered paragraph but adds a sentence on "ring tests and tag and tone visits." Fortune's third and fourth numbered paragraphs were reworded somewhat but repeated in substance as paragraphs 4 and 5 in the RFP. This was due to Mr. Tanguay's inserting a new paragraph 3 in the RFP, apparently not based on anything in the Letter of Agreement, regarding a "support model recommendation" and "IMAC activity."

CMHC sent the RFP, which was dated February 22, 2010, to Fortune (and presumably other prospective bidders) on that date. When Mr. DiMascola saw that CMHC had copied parts of the Letter of Agreement, he was upset, but he and Fortune decided to say nothing because they did not want to jeopardize their prospects for winning the CMHC contract. In March, Fortune submitted a responsive bid, every page of which was marked PROPRIETARY AND CONFIDENTIAL.

4

In June 2010, Fortune learned that CMHC had accepted a different bidder's proposal. Mr. DiMascola then filed what his affidavit terms a "protest" in which, for the first time, Fortune notified CMHC that it objected to portions of its Letter of Agreement form being incorporated into CMHC's RFP.

Fortune filed this action June 1, 2011. Its two-count complaint seeks damages for alleged violations of the Maine Uniform Trade Secrets Act ["the Act"], 10 M.R.S. §§ 1541 *et seq.*, and for unjust enrichment.

Defendant CMHC's motion for summary judgment asserts that it is not liable under the Act because (i) the four paragraphs copied or paraphrased by it were not a "trade secret" within the meaning of the Act and (ii) because Fortune failed to take reasonable measures to protect its so-called trade secret from disclosure. Fortune disputes both proposition in its objection and related filings.[2] With regard to the unjust enrichment claim, CMHC's motion asserts that it is entitled to judgment as a matter of law because the Act preempts common-law restitution claims. This, proposition, too, is disputed by Fortune.

*Analysis*

Under the well-established framework of the summary judgment rule, Rule 56 of the Maine Rules of Civil Procedure, as the movant, CMHC is required to establish that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. "Summary judgment is appropriate when review of the parties' statements of material facts and the

---

[2] Exactly what Fortune is saying CMRC purloined from Fortune's material is not entirely clear from the complaint—paragraph 8 alleges that CMHC used "verbatim specific language" for its RFP and paragraph 10 alleges that, in addition, CMHC appropriated Fortune's suggested "approach." On the other hand, Fortune's summary judgment filing regarding Count I focuses only upon the four paragraphs of the Letter of Agreement discussed herein and does not suggest that CMHC misappropriated anything in particular beyond what is contained in those paragraphs. The court therefore treats Fortune's claim for misappropriation of a trade secret in Count I as being limited to CMHC's use of those four paragraphs and not anything beyond that. However, the court does not necessarily construe Fortune's unjust enrichment claim as being limited to CMHC's use of those four paragraphs.

referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute." *Blue Star Corp. v. CKF Props. LLC*, 2009 ME 101, ¶ 23, 980 A.2d 1270, 1276 (citing *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825; *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174); *see also* M. R. Civ. P. 56.

A party wishing to avoid summary judgment must present a prima facie case for the claim or defense that is asserted. *Reliance National Indemnity v. Knowles Industrial Services*, 2005 ME 29, ¶ 9, 868 A.2d 220, 224-25. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 21-22.

In the context of this case, the primary question on CMMC's motion for summary judgment is whether the paragraphs appropriated in whole or part from Fortune's Letter of Agreement constitute a "trade secret" when the meaning of the Act. The Act provides:

> "Trade secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:
> A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and [1987, c. 143, (NEW).]
> B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S. §1542(4)

On review of the entire summary judgment record, the court finds and concludes that CMHC has shown clearly, beyond any reasonable dispute, that the copied material does not

6

constitute a "trade secret" for purposes of the Act.

First, the Letter of Agreement characterizes the four paragraphs at issue as the "minimum" for an audit. On its face, therefore, the copied material is at best a partial description of Fortune's audit methodology.

Second, nothing in the Letter Agreement—either in the form in which it appeared in the Fortune brochure or in the form in which it was twice e-mailed to CMHC—identifies the Letter Agreement itself as confidential.

Third, analyzed for substantive content, the four paragraphs contain nothing beyond what would be expected in a general description of an audit aimed at reducing expenses and cutting costs:

- The only paragraph copied verbatim—paragraph 1—describes how Fortune "[c]ompare[s] Client's current monthly billing against service provider/vendor agreements, identify billing anomalies, pursue recovery of any over payments, and work with service providers/vendors to prevent the identified issue(s) from recurring." It seems obvious that any audit designed to reduce a customer's costs for telecommunications equipment and services would cover all of those tasks and more.

- Paragraph 2 says simply that Fortune will suggest improvements ["optimization[s]"], based on its review and "then current" understanding of its client's "network environment." That concept, too, seems self-evident in the context of such an audit.

- Paragraph 3 of the Letter Agreement says Fortune will submit its report in writing with back-up materials and keep its client's confidential material confidential. Paragraph 4 of the Letter Agreement says that Fortune will follow up to assure that the recommendations that the client adopts are in fact implemented. None of this is novel or arcane or secret.

7

Fourth, as CMHC's affidavit shows, all of these concepts are readily to be found on the Wikipedia site on the Internet.

Fifth, the fact that Fortune sent its draft agreements two times to CMHC via e-mail with no reminder or designation of confidentiality is compelling evidence that Fortune itself did not regard the language as somehow constituting a trade secret.

Fortune's effort to refute CMHC's showing falls short. The affidavit of George Giardelli claims, for example, that "[t]aken together, the four paragraphs constitute more than just a general description of a generic process for doing telecommunications audits; they are an expression of Fortune's unique customer-centered approach to telecommunications audits which employs our experience and expertise to go beyond what is done in a 'normal audit' to address the bigger picture of the client's telecommunications situation." Maybe so, but Fortune's "unique . . . approach" is not a secret—presumably it is at the heart of Fortune's marketing effort.

The plain fact is that the paragraphs at issue are a generalized description of how Fortune conducts a telecommunications audit, and nothing more than that. Nothing about the specifics or details of how Fortune addresses the basic tasks identified is indicated; nothing about what technical resources, equipment or methods are deployed in the course of the audit is revealed; nothing about what kinds of "optimizations" are recommended is disclosed; no details of the procedures for validating implementation and compliance of recommended changes are revealed.

For all of these reasons, the court concludes that CMHC has shown that there is no genuine issue of material fact and that it is entitled to summary judgment on Count I of the complaint, for violation of the Act.

CMHC argues that this entitles CMHC to summary judgment as well on Count II, for

8

the Act read in part:

> Except as provided in this section, this Act displaces conflicting tort, restitutionary and other laws of this State providing civil remedies for misappropriation of a trade secret. This Act does not affect:
>> A. Contractual remedies, whether or not based upon misappropriation of a trade secret;
>> B. Other civil remedies that are not based upon misappropriation of a trade secret;

10 M.R.S. §1548

On its face, the Act preempts only restitution claims that are based on misappropriation of a trade secret as defined by the Act. Because the court has determined that CMHC did not misappropriate a trade secret, Fortune's unjust enrichment claim is not pre-empted by the Act.

Whether CMHC was enriched in any cognizable way at Fortune's expense is by no means clear, but on the present record the court cannot say that CMHC has shown it is entitled to summary judgment on Count II of the complaint. Because CMHC admittedly used some aspects of Fortune's material, there are issues of fact regarding whether CMHC realized any financial benefit from using Fortune's material in the RFP, and an issue as to whether any such benefit should be deemed unjust for purposes of restitution. CMHC's motion must be denied as to Count II of the complaint.

It is hereby ORDERED:

Defendant Central Maine Healthcare Corporation's motion for summary judgment is granted as to Count I of the complaint and denied as to Count II.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Date:   November 8, 2011

_A. M. Horton_
Justice, Business & Consumer Court

Fortune Communications, Inc., d/b/a Fortune Consulting
v.
Central Maine Healthcare Corporation
BCD-CV-2011-26

*Counsel of Record*

<u>Attorney Name</u>

William Robitzek, Esq.

Michael Poulin, Esq.
Marc Frenette, Esq.

<u>Party Name</u>

Fortune Communications, Inc.

Central Maine Healthcare Corp.
"                                    "