STATE OF MAINE                                    DISTRICT COURT
PENOBSCOT, SS.                                    Docket No. NEW- DC- CV-13-18


ACADIA RESOURCES INC.,            )
                    Plaintiff,    )
                                  )
                                  )
            v.                    )          **JUDGMENT**
                                  )
                                  )
VMS LLC and                       )
GENE VILLACCI                     )
            Defendants.    )


This matter came before the Court for a jury-waived trial on June 28, 2016, after having been filed in the Newport District Court. Attorney Economy represented the Plaintiff. Attorney Douglas represented the Defendants.[1]

## FACTS

Acadia Auto Auction (hereinafter Acadia Auto) is a wholesale business that sells used vehicles to dealers. VMS LLC (hereinafter VMS) was a dealer who sold used vehicles to consumers. In 2006, Acadia Auto and VMS began doing business together regularly.

Acadia Resources, Inc., (hereinafter Acadia Resources) provides Acadia Auction clients with financing. In August of 2006, VMS entered into a financing agreement with Acadia Resources whereby Acadia Resources would provide financing to VMS, and the financing fee was $1.00 per day per $1,000.00 borrowed. For instance, if $20,000.00 was borrowed for one day, the financing fee would be $20.00. On August 3, 2006, Gene Villacci signed, on behalf of VMS, the "master" Acadia Resources Inc. Security Agreement. Plaintiff was initially satisfied to do business with VMS, without a personal guarantee from Mr. Villacci. Mr. Villacci also signed, on behalf of VMS, the separate "Security Agreement and Promissory Note" for each vehicle financed by Acadia Resources. According to Acadia Resources, the financing was designed for the quick turn-over of vehicles to consumers by used car dealers and was not designed as floor financing, and Mr. Villacci agreed that he understood this.

The "master" Security Agreement and the agreements with respect to each individual vehicle in dispute provided that VMS granted to Acadia Resources a security interest in the vehicle and in the proceeds of the vehicle. According to Mr. Westcott, whose testimony the Court accepts, Acadia Resources could not effectively perfect its security interest in the vehicles it sold because the State of Maine refused to allowed it to do so (at the times relevant to this case).

---

[1] Attorney Douglas represented both VMS and Gene Villacci in this litigation.

It appears that the relationship between Acadia Resources and VMS was mutually beneficial until 2008 - 2009. When VMS was struggling, Acadia Resources asked Mr. Villacci for a personal guarantee, and he refused. Until February 27, 2009, Mr. Villacci and his wife were both members of VMS. Thereafter Mr. Villacci was the only member.

The financing of thirteen vehicles by VMS through Acadia Resources is at the crux of this case. Ten of the thirteen vehicles were financed by VMS in 2008, and three in 2009. Financing and other fees were charged on these vehicles beginning on June 26, 2008 continuing through May, 2013, when Acadia Resources stopped charging fees.

In 2009, VMS continued to purchase vehicles from Acadia Auto. VMS struggled, but continued to pay Acadia Resources some amounts in 2009, and Acadia Resources continued to provide financing to VMS in 2009. During 2009, VMS paid Acadia Resources over $51,000.00, the last payment having been made in December of 2009.

In 2010, VMS transferred real estate it owned at 390 Middle Rd, Falmouth, Maine to VEI, LLC. Mr. Villacci was the sole member of VEI. Mr. Villacci testified that this transfer was to prevent the property from being foreclosed upon.

There is no question that the economic downturn in 2008-2009 affected the business of both VMS and Acadia Resources. Acadia Resources was able to weather the downturn, and VMS was not. VMS was administratively dissolved in 2014.

As of May 1, 2013, VMS owed Acadia Resources $237,357.00, about $72,370.00 for the principal amount financed and about $164,987.00 in financing and other fees. There is no dispute that VMS owes Acadia Resources this amount. The real dispute in this case is whether Mr. Villacci should be held personally liable for this debt.


ANALYSIS

A member of a limited liability company is generally not individually liable for the debts of the LLC. 31 M.R.S. § 645. The concept of limited liability is a hallmark of corporate law. *LaBelle v Crepeau*, 593 A.2d 653, 655 (Me. 1991) (principal benefit of incorporation is limited liability for shareholders).

However, in this case, Acadia Resources argues that the Court should "pierce the corporate veil" and hold Gene Villacci liable for VMS's debt to Acadia Resources. Alternatively, Acadia Resources argues that Mr. Villacci should be held personally liable for the Acadia Resources debt due to his participation in wrongful acts.

A. Piercing the LLC veil

If a corporate entity is merely the "alter ego" of an individual or another corporation, the entity may be pierced. *Stanley v. Liberty*, 2015 ME 21. *Theberge v. Darbro, Inc.*, 684 A.2d 1298 (1996). However, courts must "disregard the legal entity of a corporation ... with caution and only when necessary in the interest of justice". *Theberge* (court refused

2

to pierce the corporate veil despite co-mingling of business among defendants). Additionally, in the context of a contractual dispute, courts apply "more stringent standards ... because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form". *Id.*

Disregarding the corporate veil has two prongs for analysis: (1) whether the defendant abused the privilege of a separate corporate identity; *and* (2) whether an unjust or inequitable result would occur if the court recognized the separate corporate existence. *Stanley.* The same test applies to determination whether the LLC veil should be pierced. *Town of Lebanon v. East Lebanon Auto Satles, LLC,* 2011 ME 78.

To determine whether a shareholder abused the privilege of a separate corporate identity under the first prong of the piercing doctrine, courts examine a variety factors. The Law Court has cited with approval the following twelve factors:

(1) common ownership;
(2) pervasive control;
(3) confused intermingling of business activity[,] assets or management;
(4) thin capitalization;
(5) nonobservance of corporate formalities;
(6) absence of corporate records;
(7) no payment of dividends;
(8) insolvency at the time of the litigated transaction;
(9) siphoning away of corporate assets by the dominant shareholders;
(10) non functioning of officers and directors;
(11) use of the corporation for transactions of the dominant shareholders;
[and] (12) use of the corporation in promoting fraud.

*Johnson v. Exclusive Props. Unltd.,* 1998 ME 244.

The Court makes the following findings with respect to each of the above factors:

1. At the time the majority of the vehicles in question were financed, Mr. Villacci and Helena Hollauer were both members of the LLC. On February 27, 2009, Mr. Villacci became the sole member of VMS.

2. Mr. Villacci exercised exclusive control over VMS from February 27, 2009 forward. Prior to February, 2009, Mr. Villacci, on behalf of VMS, was the person who: a) signed the "master" Security Agreement with Acadia Resources; b) signed the individual promissory notes and security agreements (Float 30) for each of the 13 vehicles at issue in this case; c) signed all the Bills of Sale for VMS as buyer of these vehicles from Acadia Auction; d) signed all the Bills of Sale for VMS as seller of these vehicles to consumers; e) signed all but one of the State of Maine transfer of ownership forms; f) signed all State of Maine Notices of Sale; and h) signed all the checks drawn on the VMS account for calendar year 2009. Additionally, Mr. Villacci signed all the IRS returns filed by VMS, other than 2005, which Helena Hollauer signed.

3

3. In 2009, over Mr. Villacci's signature, VMS issued the following checks, which were not related to the business of VMS, but related to Mr. Villacci personally:
   a. $8,000.00+ for college tuition for Mr. Villacci's daughter;
   b. $900.00+ to Maine Medical Center for medical bills incurred by Mr. Villacci for his health care;
   c. $6,684 for improvements to Mr. Villacci's personal residence (not all of these checks may have cleared); and
   d. $1,195+ for Mr. Villacci's mother's rent and homeowner's insurance, and for gifts.

   While these personal expenses were paid through the VMS account, Mr. Villacci kept clear records for his accountant denoting the nature of these expenses.

4. VMS was not a shell LLC.[2] As reflected by its income tax returns, VMS was a thriving LLC during certain years, particularly 2004 through at least some part of 2008.[3] Over the years, VMS purchased approximately 130 vehicles through Acadia. Ten of the thirteen vehicles in question in this case were financed by VMS in 2008, and three of the thirteen vehicles were financed by VMS in 2009.

   VMS held inventory in its own name.[4] During 2009, VMS also owned real estate at which business was transacted. The equity in this real property in 2008 – 2009 is not known.

   In 2009, VMS struggled financially. In March and July of 2009, the average collected balance in VMS's checking account was in the negative. Additionally, in 2009, VMS bounced several checks. VMS is now defunct.

5. VMS observed the corporate formalities of filing annual tax returns and the Annual LLC Reports. Drew Anderson was the registered agent for the LLC. Mr. Villacci had his attorney manage the formalities so that it would be "done properly".

6. The Court was presented with the annual LLC tax returns for 2004 - 2011 and the LLC Annual Reports filed with the Secretary of State for 2000 – 2013. The existence or non-existence of any other LLC records is unknown.

---

[2] Generally courts look to capitalization or solvency issues at the time the entity was formed, but there is a suggestion Maine may look to capitalization or solvency issues at the time of trial. See Zimpritch, *Maine Corporation Law and Practice* § 2.6 at 55 (3d ed. 2015).

[3] In 2007, VMS reported gross sales of $1,082,668.00, and income of $180,583.00. In 2008, VMS reported gross sales of 917,772.00, and income of $286,743.00. In 2009, VMS reported gross sales of $370,478.00, and a loss of $66,668.00.

[4] The cost of goods sold, as reflected on VMS's tax returns, indicate that the inventory during 2007 was $899,529, during 2008 was $631,029, and during 209 was $457,146. The extent to which the inventory was financed is not known.

7. There were draws by the members of the LLC. Ms. Hollauer and Mr. Villacci each drew $5,000.00 in 2009.

8. The Court is unable to determine VMS's financial condition at the time of the transactions in question. Ten of the thirteen vehicles were financed in *2008*, and three were financed in *2009*. The Court has very little information about VMS's financial condition in *2008*, when the majority of the financing agreements were executed, and the information reflected in the *2008* tax return is positive. Additionally, the value of the inventory owned by VMS in *2008 and 2009* is not known. Finally, the equity in the real property owned by VMS in *2008 and 2009* is not known.

9. The use of ("siphoning away") corporate assets by the dominant member of the LLC are the cash payments already listed in #3 above.

10. Mr. Villacci was the only member of VMS beginning on February 27, 2009.

11. Use of the LLC for Mr. Villacci's personal transactions are already listed in #3 above.

12. The Court is not satisfied that Mr. Villacci engaged in fraud or deception. It appears that the business practices of VMS and Acadia Resources were the same in 2006 as they were in 2008-2009; that is, VMS financed vehicles through Acadia Resources and sold the vehicles to consumers without disclosing to the consumer that VMS had signed a security agreement with Acadia Resources.

In addition to Mr. Villacci being the sole member of VMS, Mr. Villacci was also a member of VEI, LLC. In 2010, VMS transferred its interest in 390 Middle Rd, Falmouth, Maine to VEI to prevent a foreclosure. As noted above, while the property was at risk for foreclosure in 2010, the equity in the real estate in 2008-2009 is not known.

There is no question that Acadia Resources provided a valuable financing service to VMS, Acadia Resources has not been paid what it is owed, and VMS is now defunct.

The factor strongly supporting piercing the LLC veil is the payment by VMS of certain of Mr. Villacci's personal expenses. During 2009, Mr. Villacci used VMS to pay over $16,000.00 of his personal expenses. There was no commingling such that VMS made regular payment for Mr. Villacci's recurring personal expenses, such as utilities, food, etc., but rather, VMS funds were used to pay the specific items set forth above. Other factors supporting piercing the LLC veil are Mr. Villacci's sole membership in and control over VMS from February of 2009 forward when 3 of the 13 vehicles in question were financed.

On the other hand, VMS became a LLC sometime before 2000. Prior to 2008-2009, VMS was a thriving LLC. VMS was a regularly conducted and successful business, and an entity with which Acadia Resources desired to do business. Acadia Resources Inc., itself a corporation, chose to begin doing business with VMS without requesting any personal guarantee from Mr. Villacci. VMS existed for many years and by all accounts

5

thrived until the economic downturn in 2008-2009. Mr. Villacci tried, unsuccessfully, to save VMS.

Whether to pierce the LLC veil is a fact-intensive inquiry, and no one factor is determinative. See Zimpritch, *Maine Corporation Law and Practice*, §2.6 at 47 (3d ed 2015). Analysis of the factors set forth above suggests support for both piercing the LLC veil and not piercing the LLC veil. There is little guidance in the case law suggesting the way in which the Court should exercise its discretion in this case.[5] While Mr. Villacci kept clear records of his personal expenses, he used VMS funds to pay certain of his personal expenses, and this is a factor that causes the Court significant pause. If this were the only factor the Court were required to consider, the Court would pierce the LLC veil. However, starting from the premise that a member of a LLC will not be held personally liable for the debts of the LLC, then recognizing that this case involves a contractual dispute where the corporate plaintiff chose to do business with the LLC defendant without a personal guarantee, determining that VMS was a legitimate LLC that in fact conducted regular legitimate business during the time frame in question, and that VMS operated successfully for several years before the economic downturn, the Court is not persuaded that the Plaintiff has established by a preponderance of the evidence that Mr. Villacci abused the separate LLC form such that the LLC veil should be pierced in this case.


B. Wrongdoing

Alternatively, Acadia Resources urges the Court to hold Mr. Villacci personally responsible for VMS's debt to Acadia Resources due to Mr. Villacci engaging in "wrongdoing". Corporate officers who participate in wrongful acts can be held liable for their individual acts, and such liability is distinct from piercing the corporate veil. *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101 (question of fact whether corporate officer could be held individually liable due to engaging in fraud or by signing a side agreement). The individual liability stems from participation in a wrongful act, and not from facts that must be found in order to pierce the corporate veil. *Id.* Corporate employees who commit an unfair trade practice within the scope of their employment can be held personally liable. *Advanced Construction Corp. v. Pilecki*, 2006 ME 84 (evidence that president of corporation violated HCCA, UTPA and DTPA sufficient to impose individual liability) *Mariello v. Giguere*, 667 A.2d 588, 590-91 (Me. 1995) (affirming personal liability of a corporate employee for fraudulent misrepresentation).

When VMS financed a vehicle through Acadia Resources and then sold the vehicle to a consumer, VMS completed Bureau of Motor Vehicles forms that recited there were no lienholders for that vehicle. Plaintiff argues that Mr. Villacci's signing of the Bureau of Motor Vehicle forms stating that there were no lienholders and not honoring the security interest in the sale proceeds as set forth in the "master" security agreement and each of the individual security agreements constitutes "wrongdoing".

---

[5] As noted, "[T]he boundaries of the doctrine [piercing the corporate veil] are imprecise, the inquiry is heavily fact-specific and Maine case law on the subject is not extensive". Zimpritch, *supra* § 2.6, at 47.

As noted by Mr. Westcott, Acadia Resources did not effectively perfect its security interest. The Court accepts Mr. Westcott's testimony that it was unable to do so because the State refused to issue titles to vehicles in the name of a dealer. Mr. Westcott further testified that whether there would have been difficulty transferring ownership of a vehicle to a consumer if Acadia Resources had been listed on the documents as a lienholder had "never been tested".

Acadia Resources' "master" Security Agreement included, among others, the following provisions:

1) auction will hold title until dealer instructs auction to forward title,

2) auction will then deposit check and forward title,

3) dealer must leave separate check for balance on each unit purchased to release title, and

4) dealer must notify Acadia Resources within 24 hours of sale of any unit. We will then deposit the check and forward the title.

It appears that neither Mr. Villacci nor Acadia Resources followed the procedure set forth in the Security Agreement with respect to titles to the vehicles in question. Mr. Westcott testified that listing Acadia Resources as a lienholder on the Bureau of Motor Vehicles documents had "never been tested". Therefore, it appears the course of dealing between Acadia Resources and VMS did not include Acadia Resources being named as a lienholder on the Bureau of Motor Vehicle documents. It does not appear that anyone who purchased one of the subject vehicles from VMS had difficulty securing title; thus, Acadia must have acquiesced and forwarded the titles to the State prior to being paid by VMS.

While VMS did not pay Acadia Resources when payments were due, the Court does not find that Mr. Villacci participated in "wrongful acts" of a nature that justifies imposing personal liability on him under a "wrongdoing" theory. The economy took a downturn and VMS was significantly adversely affected. The mutual failure to follow the provisions of the security agreements is not the type of "wrongful acts" for which the Court will hold Mr. Villacci personally liable for VMS's debts to Acadia Resources.

The Clerk shall enter the following upon the docket:

Judgment for the Plaintiff against Defendant VMS, LLC in the amount of $237,357.00 on Counts 1, 4, and 5. Having found a contract, Judgment for VMS, LLC on Count 3.

Judgment for Plaintiff on Count 2.

Judgment for Defendant Gene Villacci on all counts

All pending motions are moot.

August 21, 2016

Date entered on Civil Docket: 8/26/16

Ann M. Murray, Justice
Maine Superior Court

7